**AMERICAN FEDERATION OF LA-BOR–CONGRESS OF INDUSTRIAL ORGANIZATIONS et al., Plaintiffs,**

v.

**CITY OF MIAMI et al., Defendants.**

**Case No. 07–22966–CIV.**

United States District Court,
S.D. Florida.

Sept. 2, 2009.

Jonathan C. Moore, Beldock Levine & Hoffman LLP, New York, NY, Kathy L. Krieger, James & Hoffman P.C., Washington, DC, Mara Shlackman, Mara Shlackman PL, Fort Lauderdale, FL, Rae Shearn, Rae Shearn Law Offices, Roy D. Wasson, Miami, FL, Robert William Ross, Jr., Ross Law Firm, Lake Worth, FL, Plaintiffs.

Warren Bittner, Miami City Attorney's Office, Miami, FL, Ronald Jay Cohen, Cohen & Rind, P.A., Miami Lakes, FL, for Defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

URSULA UNGARO, District Judge.

THIS CAUSE is before the Court upon Defendants' Amended Motion for Final Summary Judgment, filed April 7, 2009 (D.E. 221). Plaintiffs filed their response in opposition on April 25, 2009 (D.E. 239), to which Defendants replied on May 8, 2009 (D.E. 247). As such, the Motion is now ripe for adjudication.

THE COURT has considered the Motion and the pertinent portions of the rec-

ord and is otherwise fully advised in the premises.

### Background

This action arises out of the Free Trade Area of the Americas ("FTAA") summit in November 2003 in Miami, Florida, and a series of protests of that summit. (Defs' Amended Concise Statement of Material Facts ("DSMF"), D.E. 221–2, ¶ 1; Pls' Resp. to Defs' Facts ("PRF"), D.E. 237, ¶ 1.)

### I. The Parties

Plaintiff American Federation of Labor–Congress of Industrial Organizations ("AFL–CIO") is a federation of labor organizations that sponsored several activities the week of the FTAA summit. Plaintiffs Thea Lee ("Lee"), Deborah Dion ("Dion"), Michael Cavanaugh ("Cavanaugh"), and Stewart Acuff ("Acuff") are AFL–CIO employees who organized and attended the AFL–CIO events that week.

Plaintiff Florida Alliance for Retired Americans ("FLARA") is a non-profit organization that worked with the AFL–CIO to provide FTAA-related programs for senior citizens in November 2003.

Defendant City of Miami ("City") is a municipal corporation that hosted the FTAA summit. Defendant John Timoney ("Chief Timoney") is a City employee and was, at all relevant times, the Chief of the City's police department. Chief Timoney was commander of the City's FTAA law enforcement operation, which included surveillance activities, deployment of personnel, and the selection of weapons used. (D.E. 236–5 at 11.) Defendant Frank Fernandez ("Deputy Chief Fernandez") is a City employee and was, at all relevant times, Deputy Chief of the City's police department. Deputy Chief Fernandez had the overall responsibility for FTAA planning and preparations. (Frank Fernandez Aff., D.E. 207, ¶ 1.) Defendant Thomas Cannon ("Captain Cannon") is a City employee and was, at all relevant times, a captain in the City's police department. Captain Cannon commanded the field operations during the FTAA demonstrations. (PRF ¶ 7.)

### II. Preparations for FTAA Summit and Protests

In anticipation of the FTAA summit, the AFL–CIO obtained permits from the City for a series of assemblies and a protest march. (DSMF ¶ 2; PRF ¶ 2.) Additionally, the AFL–CIO rented the Bayfront Park Amphitheater for an evening gala on November 19, 2009, and for a rally on November 20, 2009. (DSMF ¶ 3; PRF ¶ 3.) The AFL–CIO contracted to have City police officers provide security at Bayfront Park Amphitheater. (DSMF ¶ 4; PRF ¶ 4.) The AFL–CIO also contracted with outside vendors to supply the goods and services for its events, including lighting, sound and video crews, bottled water, signs, portable toilets, and buses. (DSMF ¶ 4; PRF ¶ 4.) Together with the FLARA, it arranged for chartered buses to transport senior citizens to the events. (PRF ¶ 27.)

The City's police department (the "MPD") began preparing for the FTAA summit approximately eleven months prior to the event. (DSMF ¶ 4; PRF ¶ 4.) Deputy Chief Fernandez and Captain Cannon developed the operational plan for the FTAA summit. (Fernandez Dep., Dec. 1, 2004, 39:14–18.) The MPD enlisted help from several other law enforcement agencies, such as the Broward Sheriff's Office and the City of Miami Beach Police Department. (DSMF ¶ 7.) These assisting agencies operated under Mutual Aid Agreements executed in October or November 2003, wherein they agreed to provide operational assistance to the City during the FTAA summit. (DSMF ¶ 8; PRF ¶ 7.) Nonetheless, MPD retained overall

command and control of the relevant policing activities during the FTAA. (*See* DSMF ¶ 9.)

The FTAA steering committee, which was chaired by Deputy Chief Fernandez, developed Rules of Engagement for the purpose of interacting with protestors. (*See* Michael Colombo Dep., Jan. 21, 2009, 12:16–22.) All assisting agencies agreed to comply with the Rules of Engagement as a condition of providing assistance during the FTAA. (Frank Fernandez Aff., D.E. 207, ¶¶ 4–5.) Each agency providing assistance was responsible for training its respective personnel on the parameters of the Rules of Engagement. (*Id.*)

On November 13, 2003, days before the FTAA summit, the Miami City Commission passed City Code Section 54–6.1, entitled "Parade and Assembly Prohibitions." That ordinance criminalized the possession of a variety of objects, including, *inter alia*, glass bottles, stones, and pieces of metal or plastic outside certain size restrictions, by any person gathered in a group of more than eight persons at a public place for a common purpose for more than thirty minutes.

## III. The AFL–CIO Events at the FTAA

The first major AFL–CIO event the week of the FTAA summit was a labor forum held on November 18, 2003, at the Gusman Theater in Miami, Florida. (Lee Dep. 10:2–14.) The event took place as scheduled, but not as planned. (Lee Dep. 10:13–14.) There was an extraordinary police presence outside the theater, police were "stopping and questioning everybody," and the forum was not as well attended as Plaintiffs expected. (*See* Lee Dep. 11:2–16.)

On November 19, 2003, the AFL–CIO held a gala at the Bayfront Park Amphitheater, which also took place as scheduled but not as planned. (Cavanaugh Dep., Aug. 14, 2009, 34–35.) Daytime prepara-

tions for the event were disrupted because police denied vendors access to the venue, and staff members were harassed by policemen who pointed guns at their heads several times during the day. (Dion Dep. 41:14–22.) An unknown officer at the access gate to the Bayfront Park Amphitheater briefly pointed a gun at Plaintiff Dion's head. (DSMF ¶ 33.) Dion felt physically threatened and feared for her safety. (PRF ¶ 33.) The gala itself was covered by hundreds of police in riot gear, there were high security fences erected around the area, and loud helicopters flew overhead. (Cavanaugh Dep., 35:12–20; Acuff Dep., Aug. 11, 2008, 13:4–24.) As a result, attendance for the event was lower than anticipated. (Cavanaugh Dep. 42:3–25; Acuff Dep. 14:1–5.)

The AFL–CIO had several events scheduled for next day, November 20, 2003. First, there was a senior breakfast scheduled for 10:00 a.m. in the Bayfront Park Amphitheater. Second, there was a rally scheduled in the Bayfront Park Amphitheater for 12:00 p.m. Third, there was a permitted march scheduled for 2:00 p.m. All events were disrupted. (*See* Lee Dep., Aug. 8, 2008, 15–16.)

The disruptions began at approximately 7:30 a.m. when police locked down the Bayfront Park Amphitheater and prevented event preparations and volunteer training during that time. Two unnamed officers confronted Plaintiffs Cavanaugh and Dion, put guns in their faces, and told them to sit down. (Cavanaugh Dep. 46:4–10; 49:3–17; Dion Dep. 50:13–21.) Other officers threateningly beat their batons on chairs. (Cavanaugh Dep. 47:17–21.) Acuff was also locked down in the amphitheater. (DSMF ¶ 42; PRF ¶ 42.) The lock down lasted approximately one-and-a-half to two hours. (DSF ¶ 38; PRF ¶ 38.)

The 10:00 a.m. senior breakfast was also disrupted. Plaintiffs had arranged for

charter buses to drop off seniors at a convenient location in order for them to attend the breakfast. (Lee Dep. 17:13–25.) Police told some buses, however, to turn around and return home, which the buses did. (Dion Dep. 48:8–15.) Other buses dropped the seniors off at a location several blocks away from the event. (Dion Dep. 48–48.) Consequently, many seniors were unable to attend the senior breakfast; those that were able to attend were shook up, scared, and angry. (Cavanaugh Dep. 54–55; Lee Dep. 18:11–15.) Additionally, the AFL–CIO did not have access to the food or water that they had purchased for the seniors. (Lee Dep. 18:11–15.)

Between 11:00 a.m. and 12:30 p.m., unidentified police locked down the Bayfront Park Amphitheater a second time and erroneously told potential rally attendees that they could not enter because the rally was an union-only event. (Cavanaugh Dep. 58:11–23.) The police officers also threw some potential attendees onto the ground, at which time other potential attendees "backed off" and did not attend the rally. (*Id.*) Additionally, the police denied protestors, including Plaintiff Acuff, access to the rented port-a-potties. (DSF ¶ 22(c); PRF ¶ 22(c); Acuff Dep. 72:15–23; 91:15–23.)

The AFL–CIO protest march was scheduled to depart from the Bayfront Park Amphitheater. (Cavanaugh Dep. 63:6–24.) The police presence inside and outside the amphitheater disrupted the beginning of the march, and police vehicles blocked the march leaders' access to the public roads. (*Id.*) Once the march leaders found their way outside the amphitheater, they discovered that their permitted route had been blocked by police. (Cavanaugh Dep. 64:11–17.) The AFL–CIO affiliated demonstrators marched an abbreviated route and dispersed after the march ended. (Cavanaugh Dep. 65–66.)

After the AFL–CIO march, Cavanaugh and Acuff heard shots and observed people shouting and running. (Cavanaugh Dep. 66:13–25; Acuff Dep. 70:19–24.) Cavanaugh observed a police line marching north on Biscayne Boulevard, discharging less lethal weapons such as pepper balls and bean bags. (*See* Cavanaugh Dep. 67:19–23.) Tear gas was lobbed in the direction of Acuff, causing his eyes to burn and sting. (Acuff Dep. 71:1–4; 89:1–2.) Cavanaugh, Dion, and others retreated inside the Bayfront Park Amphitheater. (Cavanaugh Dep. 71–72; Dion Dep. 59:1–9.) The amphitheater was locked down for a third time (after Cavanaugh, Dion, and others were inside), and it remained locked down for a couple of hours. (DSMF ¶ 26; Cavanaugh Dep. 71:13–19; Dion Dep. 59:1–25; 101:16.) While inside, Dion felt the effects of tear gas being used outside the amphitheater. (DSMF ¶ 35; PRF ¶ 35.)

After the AFL–CIO march, Acuff also tried to retreat into the Bayfront Park Amphitheater. When he arrived, however, the doors to the amphitheater were locked, and police pinned him to a railing outside the amphitheater. (DSMF ¶ 46; Acuff Dep. 71:14–17.) There was tear gas and pepper spray in the air, and Acuff had nowhere to go for over an hour because armed police formed a human barricade around himself and other civilians. (Acuff Dep. 72:7–11; 81:5–6; 98:1–9.)

Lee had also participated in the AFL–CIO march and, immediately thereafter, returned to her hotel to make sure AFL–CIO officials departed Miami on schedule. (Lee Dep. 44–46.) After returning to the hotel, Lee stood outside the hotel and "walked a little ways down Biscayne Boulevard" towards the FTAA summit. (Lee Dep. 46:22–23; 48:11–13.) Lee observed "many protestors *and other bystanders* . . . ." (Lee Dep. 48:19–23 (emphasis add-

ed).) Lee stated she was "milling around" when a police line approached from the south. (Lee Dep. 50:15–24.) The "police line was not moving particularly fast," but Lee went down a side street in order to move away from the police line before it reached her. (Lee Dep. 51:1–3; 57:21–23; 58:12–14.) A police line followed her down the side street, shooting. (Lee Dep. 58:20–22.) The air was filled with noxious fumes, which caused Lee's eyes to tear and burn. (Lee Dep. 67:14–25.) Lee found herself "cornered" with some senior AFL–CIO members on the side street by two advancing police lines. (Lee Dep. 61:2–14.) The police lines eventually relented, the seniors boarded their bus, and Lee tried to make her way back to her hotel. (Lee Dep. 61:17–21.) Lee's route to her hotel was continuously blocked by police lines, and she found herself walking for a couple of hours. (Lee Dep. 64:5–8.) Lee eventually confronted the police and told them it was a "shame that the police were using rubber bullets and pepper spray on peaceful protestors," to which a unidentified policemen responded by swearing at her. (DSMF ¶ 55; Lee Dep. 65:1–11.)

The command to the deploy the less lethal munitions and move demonstrators away from the FTAA summit with a police line on Biscayne Boulevard was given after the AFL–CIO march concluded (at approximately 3:00 p.m.) because a "very large crowd was … forming and starting to move toward the police line" and because a certain contingent of protestors ultimately became violent on the police lines. (Cannon Dep. Apr. 9, 2007, 55:8–17; Cannon Dep., July 14, 2005, 68:2–4.) Captain Cannon believed that during this time individuals associated with the AFL–CIO and their retiree groups had left the area. (Cannon Dep., Apr. 9, 2007, 17:4–16.) Deputy Chief Fernandez made the decision to move demonstrators on Biscayne Boulevard using a police line, and Captain Cannon gave the command to discharge the less lethal weapons. (Cannon Dep., July 14, 2005, 72:4–11; Fernandez Dep. July 14, 2005, 14–15.) Captain Cannon stated that he and Deputy Chief Fernandez were both on-site, conferring on what actions they wanted the police to take. (Cannon Dep. April 9, 2007, 11:19–21.) Chief Timoney approved the orders of the City's law enforcement officers under his command to fire less lethal weapons into the crowd of protestors and to advance the police line north on Biscayne Boulevard. (Chief Timoney's Response to Request for Admissions, D.E. 236–5.) Chief Timoney directed and authorized the police tactics utilized on November 20, 20003. (Fernandez Dep., 68:7–11.)

## IV. Plaintiffs' Claims

On October 15, 2007, Plaintiffs filed their original Complaint seeking damages and declaratory and injunctive relief for Defendants' alleged constitutional and state law violations (D.E. 1), and amended their complaint on January 30, 2008 (D.E. 61, the "Amended Complaint"). Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint on March 5, 2008 (D.E. 77), which the Court granted in part and denied in part. (*See* D.E. 167, the "Order MTD".) Defendants now seek judgment as a matter of law on Plaintiffs' remaining claims, which can be grouped into the following four categories:

(i) *Monell* **Liability Claims Against the City**—*Count 1* alleges that the City is liable for its official policies that violated Plaintiffs' First Amendment rights; *Count 3* alleges that the City is liable for the actions of its final policymaker, Chief Timoney, which constituted unofficial City custom and violated Plaintiffs' First Amendment rights; *Count 4* alleges that the City is liable for its official policies of inadequate training of its officers for policing duties during the FTAA, which resulted in violations

of Plaintiffs' First, Fourth, and Fourteenth Amendment rights; *Count 6* alleges that the City is liable for official policies that violated Plaintiffs' Fourth Amendment rights; *Count 8* alleges that the City is liable for the actions of its final policymaker, Chief Timoney, which constituted unofficial City custom and violated Plaintiffs' Fourth Amendment rights; *Count 11* alleges that the City is liable for its official policies that violated Plaintiffs' Fourteenth Amendment rights.

(ii) **Civil Conspiracy Claims**—*Count 9* alleges that the City conspired with other municipalities to deprive Plaintiffs' of their civil rights; *Count 10* alleges that the individual defendants conspired to deprive Plaintiffs' of their civil rights.

(iii) **Supervisory Liability Claims**— *Count 12* and *Count 13* allege that the individual defendants directed acts that violated Plaintiffs' First and Fourth Amendment rights; *Count 15* alleges that the individual defendants failed to intervene and countermand the orders that proximately caused Plaintiff Lee's Fourth Amendment violations.

(iv) **State Law Claims**—*Count 17* and *Count 18* allege that law enforcement officers assaulted and battered Plaintiff Lee; *Count 20* alleges that law enforcement officers assaulted Plaintiffs Dion, Cavanaugh, and Acuff; *Count 22* alleges that the law enforcement officers converted Plaintiff AFL–CIO's property; *Count 23* alleges law enforcement officers trespassed on Plaintiff AFL–CIO's property; *Count 25* alleges a negligence against the City by Plaintiff Lee.[1]

Defendants argue in their Motion that there are no genuine issues of material fact as to any of Plaintiffs' foregoing claims and that they are entitled to a judgment as a matter of law. The Court will address each of their challenges below.

### LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The Supreme Court explained in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion.

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997); *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Envtl.*

---

1. In its Order on Defendants' Motion to Dismiss, the Court dismissed Count 25 only to the extent that it pertains to the actual application of force. (Order MTD at 14 n. 6.)

*Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981).[2] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.,* 669 F.2d 1026, 1031 (5th Cir.1982); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes,* 398 U.S. at 160, 90 S.Ct. 1598. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611–12 (5th Cir.1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505.

### Analysis

**I. Plaintiffs' *Monell* Constitutional Law Claims**

 A court must separate two different issues when a claim is asserted against a municipality under 42 U.S.C. § 1983:(1) whether plaintiff's harm was caused by a constitutional violation; and, (2) if so, whether the city is responsible for that violation. *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). As to the second issue, a local government cannot ordinarily be held liable under § 1983 pursuant to a theory of respondeat superior for the actions of its employees or agents. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Instead, it is when execution of a government's policy or custom, whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

 The Supreme Court later clarified its holding in *Monell,* making clear that "municipal liability is limited to action for which the municipality is actually responsible" and that such action may be a single decision by municipal policymakers or a widely-adopted policy. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). A plaintiff must identify either "(1) an officially promulgated [city] policy or (2) an unofficial custom or practice of the [city] shown through the repeated acts of a final policymaker for the [city]." *Grech v. Clayton County,* 335 F.3d 1326, 1329 (11th Cir.2003). "Municipal liability under 42 U.S.C. § 1983 may be premised upon a single illegal act by a municipal officer only when the challenged act may fairly be said to represent official policy, such as when that municipal officer possesses final policymaking authority over the relevant subject matter." *Morro v. City of Birmingham,* 117 F.3d 508, 510 (11th Cir.1997).

---

**2.** Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

## A. Counts 1 and 3—*First Amendment*

Count 1 alleges that the City adopted City Code 54–6.1 (2003) (the "Parade and Assembly Ordinance") just prior to the FTAA meetings with the express intent of limiting First Amendment speech and to provide a pretext for law enforcement agencies to use of force against peaceful protestors. Additionally, Count 1 alleges that the City, through the MPD and the City Commission, adopted the Security Plan,[3] Mutual Aid Agreements, and unwritten policies that proximately caused the deprivation of Plaintiffs' First Amendment rights.

Count 3 also alleges violations of Plaintiffs' First Amendment rights by way of the Mutual Aid Agreements, the Security Plan, the field plan, and unwritten policies. Count 3 differs from Count 1, however, in that it alleges that Chief Timoney was the final policymaker with respect to these policies and that he implemented them in a way that proximately caused violations of Plaintiffs' First Amendment rights.

Defendants argue that they are entitled to summary judgment on these counts because (i) there is no evidence that the Parade and Assembly Ordinance was used as a pretext to justify an assault upon or arrest of any Plaintiff; (ii) there is no evidence that the Mutual Aid Agreements had any connection to Plaintiffs' alleged First Amendment violations; (iii) there is no evidence of any unwritten components of the Security Plan that included political or ideological profiling, harassment or herding of protestors, and, therefore, no unwritten components could have proximately caused a deprivation of First Amendment rights; (iv) there is no causal connection between the Parade and Assembly Ordinance, the Mutual Aid Agreements, or unwritten components and the alleged constitutional violations; and (v) there is no evidence that the Plaintiffs suffered violations of their First Amendment rights due to Chief Timoney's actions.

■ The Court finds that there are no genuine issues of material fact as to Counts 1 and 3, and therefore, summary judgment is appropriate as to these counts. First, as to the Parade and Assembly Ordinance, the Court finds that Plaintiffs fail to establish the "affirmative link" between the ordinance and the deprivation of their First Amendment rights, which is necessary to hold the City liable under § 1983. *See Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir.1987) (holding that a plaintiff must put forth evidence of an "affirmative link" between the policy and the injury to recover under § 1983); *Rauen v. City of Miami*, 613 F.Supp.2d 1324, 1336 (S.D.Fla. 2007) ("Even if the [Parade and Assembly Ordinance] was unconstitutional . . . there would not necessarily be a sufficient nexus between the passage of the ordinance alone and Plaintiffs' alleged injuries to support a *Monell* claim."). Plaintiffs present no evidence that they suffered an injury *because of* the passage of Parade and Assembly Ordinance.[4] Their blanket as-

---

3. Although mentioned in their Complaint, Plaintiffs do not introduce facts describing the "Security Plan" (or why it supports their claims) in their Response.

4. Plaintiffs argue that the City Commissioners' statements regarding the purpose of the Parade and Assembly Ordinance demonstrate that it was targeted at the FTAA demonstrations. This does not mean that it was intend-

ed to suppress lawful and peaceful demonstrations. The Court has reviewed the City Commissioners' statements that Plaintiffs argue demonstrate that the Ordinance was passed with the "intent and purpose of restricting First Amendment rights and directing and enabling the police to do the same." (Resp. 4.) The Court finds no such express intent. The City Commissioners' statements only tend to show that the they were con-

sertion that the Parade and Assembly Ordinance was the "factual predicate" for the use of force by the police does not create a genuine issue of material fact. Although Plaintiffs argue that the Rules of Engagement permitted the use of force in the event any protestor violated the Parade and Assembly Ordinance, they fail to draw the affirmative link between their injuries and the Parade and Assembly Ordinance. Plaintiffs present no evidence that the force used against them was pursuant to the Rules of Engagement because they violated the Parade and Assembly Ordinance.

■ Second, as to the Mutual Aid Agreements, the Court finds that Plaintiffs have failed to demonstrate that such agreements represent a policy intending to suppress speech. As one court aptly stated in FTAA-related case, "The fact that the City asked for assistance from other agencies cannot, by itself, amount to a policy of violating constitutional rights." *Rauen*, 613 F.Supp.2d at 1336.

■ Third, the Court finds that the "unwritten components of a security plan" do not tend to show that City adopted a policy to suppress Plaintiffs' First Amendment rights. Plaintiffs assert that the MPD slide show briefing on the FTAA meetings reflect an unwritten policy of ideological and political profiling of FTAA protestors. The Court has reviewed the slide show and finds that it fails to create a genuine issue of material fact for trial as to the City's liability. As an initial matter, Plaintiffs fail to adduce evidence that the slide show was generated by a final policymaker such that it reflects City policy. *See Battiste v. Lamberti*, 571 F.Supp.2d 1286, 1313 (S.D.Fla.2008) (finding that the City's FTAA slide show failed to create a genuine

issue of material fact for trial). Also, the slide show does not suggest that the City had a policy of suppressing free speech at the FTAA meetings; it shows that the MPD recognized that 98% of the demonstrators were likely to be peaceful and that one of its responsibilities at the FTAA summit is to protect the civil liberties of law-abiding protestors and demonstrators. (*See* D.E. 229–2.)

■ Fourth, as to Chief Timoney's involvement as a final policymaker, Plaintiffs assert that he authorized and directed the acts that caused Plaintiffs' injuries, or, alternatively, he delegated such authority to Captain Cannon. Plaintiffs also assert that Chief Timoney was present at the demonstrations and "thus able to make decisions on the scene." (Resp. 6.) Plaintiffs, however, fail to present any evidence that Chief Timoney authorized or directed the acts that caused their injuries, or that he delegated such authority to Captain Cannon. Their argument then rests on mere allegations, which do not create genuine issues of material fact for trial. Moreover, simply because Chief Timoney was able to make decisions at the FTAA summit does not mean that he did, and it certainly does not mean that any he committed an illegal act that "may fairly be said to represent official policy." *Morro*, 117 F.3d at 510.

In sum, Plaintiffs fail to show that there are genuine issues of material fact as to whether their injuries were a result of a City policy or custom to suppress speech. Accordingly, the Court grants summary judgment in favor of Defendants as to Counts 1 and 3.

cerned about those "troublemakers" who might attend the FTAA and pose a danger to the peaceful demonstrators; the Commissioners expressly state that they wish to protect

the safety and First Amendment rights of peaceful demonstrators. (*See, e.g.,* D.E. 236–2 pp. 20–21.)

## B. Count 4—*Failure to Train and Supervise*

Count 4 alleges that the City failed to adequately train and supervise the officers and supervisors under its command for their policing responsibilities at the FTAA meetings, resulting in violation of Plaintiffs' First, Fourth, and Fourteenth Amendment rights. Plaintiffs allege that the City's failure to train and supervise those under its command is part of a pattern or practice that is tantamount to City policy.

The "City is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated [Plaintiffs'] constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Rather, there are limited circumstances where an allegation of failure to train or supervise can serve as the basis for § 1983 liability. *Id.* A city must either have an express written or oral policy of inadequately training and supervising its employees, or its failure to train and supervise must amount to "deliberate indifference to the rights of persons with whom the police come into contact." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). To establish liability for a city's 'deliberate indifference,' a "plaintiff must present some evidence that the [city] knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* at 1350–51. "Without notice of a need to train in the area that turned out to be inadequate, the [city] is not liable as a matter of law ... This high standard of proof is intentionally onerous for plaintiffs." *Owaki v. City of Miami*, 491 F.Supp.2d 1140, 1158–59 (S.D.Fla.2007) (citing *Gold*, 151 F.3d at 1351).

Plaintiffs allege that the City was put on notice of a need to train or supervise in the area of First Amendment expression when the "Ad Hoc Committee to Investigate Police Community Relations" released its 2000 Official Report.[5] Plaintiffs, however, appear to abandon this allegation as they do not cite to the 2000 Official Report for support in their Response to Defendants' Motion for Summary Judgment, nor do they appear to provide the 2000 Official Report in the record. Instead, Plaintiffs argue in their Response that there are genuine issues of material fact as to Count 4 because (i) MPD concluded its training of its field forces before the Rules of Engagement were finalized, and (ii) the Rules of Engagement themselves were deficient in light of a United States Department of Justice "report."[6]

5. In another FTAA-related case, plaintiffs similarly relied on the 2000 Official Report, but the court found that the report failed to create a genuine issue of material fact as to the plaintiffs' failure to train claims and granted defendants summary judgement. *See Battiste v. Lamberti*, 571 F.Supp.2d 1286, 1311–12 (S.D.Fla.2008) (finding that the 2000 Official Report was not evidence of a deliberate choice not to take any action on police training).

6. The Civil Rights Division of the U.S. Department of Justice investigated the MPD, at the request of the mayor and chief of police in 2002, and issued a letter on its preliminary findings in 2003. (D.E. 229–6.) The 2003 letter identified issues of concern, including the MPD's use of force and search and seizure, and made recommendations on those issues to Chief Timoney. Plaintiffs do not show how the Rules of Engagement were deficient in light of the 2003 letter; Plaintiffs simply state that there was a deficiency. Moreover, Plaintiffs' "deficient" training argument is a non-starter. The City is not liable under Section 1983 "even if it inadequately trained or supervised its police officers and those officers violated [Plaintiffs'] constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir.1998). Instead, Plaintiffs must show that there is a genuine issue of material fact as to the City's deliberate indifference to their rights. *Id.* This they have not done.

■ These allegations are insufficient to create a genuine issue of material fact for trial as they do not support a finding that (i) the City had expressly adopted a policy that caused Plaintiffs' injuries, or (ii) the City was put on notice of a need to train or supervise in the area of First, Fourth, and Fourteenth Amendment rights, but deliberately chose not to take any action. Thus, even if the City's practices resulted in the deprivation of Plaintiffs' constitutional rights, there "is no evidence that would allow a jury to find that the City knew or should have known that the natural consequence of its policy and practices would be a deprivation of constitutional rights." *Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1987). Consequently, Defendants are entitled to judgement as a matter of law on Count 4.

### C. Counts 6, 8, and 11—*Fourth and Fourteenth Amendments*

Counts 6 and 8 are parallel to Counts 1 and 3, but pertain to Plaintiffs' Fourth Amendment rights rather than their First Amendment rights. Count 11 contains similar factual allegations as Counts 6 and 8, but adds that Plaintiffs were denied their right to liberty and property by Defendants' denial of, *inter alia,* access to bottled water, use of portable toilets, and by Defendants' blockade that prevented charter buses from bringing participants to Plaintiffs' scheduled events. Defendants' arguments for summary judgment on Counts 6, 8 and 11 are largely identical to their challenges of Counts 1 and 3: There is no evidence that Plaintiffs suffered a constitutional violation, and there is no evidence that the Security Plan, Mutual Aid Agreements, and unwritten policies proximately caused the deprivation of Plaintiff's constitutional rights.

■ In response, Plaintiffs argue that they were searched and seized at the FTAA summit in violation of their Fourth Amendment rights, they were not able to march their scheduled route, and their message was hindered because of "climate of fear created by the police." Plaintiffs add that the fact that they are unable to prove that the offending actions were those of City officers is not dispositive because the City officers are liable under the doctrines of concurrent causation and joint tortfeasor liability. This is nothing but misdirection. Even if Plaintiffs were unlawfully searched and seized by City officers, Plaintiffs have not demonstrated that the actions complained of were taken pursuant to City policy or custom. Nor have Plaintiffs demonstrated that the police conduct that allegedly hindered their scheduled events were carried out pursuant to a City policy or custom. Rather, Plaintiffs rely on their arguments in support of Counts 1 and 3, which the Court has fully addressed and rejected above. In short, Plaintiffs' claims under the Fourth and Fourteenth Amendments fail

Plaintiffs also cite to a Civilian Investigative Panel Report in their Response, which was compiled after the FTAA meetings, in support of their failure to train/supervise claim. (Resp. 8.) Plaintiffs' citation, however, appears to be in error because it does not refer to the Civilian Investigative Panel Report but instead to a letter sent from the Chairperson of the Civil Investigative Panel to the Mayor and City Commissioners. (*See id.* (citing D.E. 202–7, p. 14.)) The letter does not state that the City inadequately trained its police on First Amendment rights. (*See id.*) Even if the Civilian Investigative Panel Report or letter had made such a statement, however, the Court would still grant Defendants' Motion as to Count 4 because such a statement could not put the City on notice of the need to train or supervise *prior to* the FTAA meetings. There can be no deliberate indifference liability without notice. *Gold,* 151 F.3d at 1351 ("This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise.").

for the same reason their First Amendment claims fail: Plaintiffs adduce no evidence from which a jury could infer that the City's allegedly violative policies were the "moving force" of their injuries. Therefore, the Court grants Defendants' Motion on Counts 6, 8, and 11.

## II. Civil Conspiracy Claims

Counts 9 and 10 allege that the City and individual defendants Chief Timoney, Deputy Chief Fernandez, and Captain Cannon agreed and conspired among themselves and with other municipalities, under color of law, to deprive Plaintiffs of their First, Fourth, and Fourteenth Amendment rights. With respect to the City, Plaintiffs allege that the overt acts in furtherance of the conspiracy between the City and other municipalities include, *inter alia,* developing unwritten agreements to unlawfully restrict the exercise of free speech, assembly, and association by Plaintiffs and others during the FTAA summit through a show of overwhelming force; adopting a "single plan and a single command" for policing Plaintiffs' First Amendment activities in opposition to the FTAA"; profiling protestors according to their political and ideological beliefs; adopting the Rules of Engagement, which are devoid of any meaningful guidance or instruction on how to protect protestors' First Amendment rights; developing the Security Plan; and training officers to enforce the Parade and Assembly Ordinance. With respect to Chief Timoney, Deputy Chief Fernandez, and Captain Cannon, Plaintiffs allege that these individual defendants reached an unwritten agreement on November 20, 2003, to violate Plaintiffs' constitutional rights by terminating the demonstrations, locking down the Bayfront Park Amphitheater, and using overwhelming force to move a gathered crowd. Plaintiffs allege that Defendants implemented this conspiracy on November 20, 2003, by, *inter alia,* forming police lines to

herd demonstrators, detaining AFL–CIO staffers at gunpoint, and searching and seizing peaceful activists attending Plaintiffs' events.

■ In order to establish the existence of a civil conspiracy, Plaintiffs must demonstrate "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff." *Bivens Gardens Office Bldg. v. Barnett Banks of Fla., Inc.,* 140 F.3d 898, 912 (11th Cir.1998). Defendants argue that Plaintiffs have failed to produce evidence supporting these elements. In response, Plaintiffs argue that there is sufficient circumstantial evidence to support an inference of a conspiracy. Plaintiffs point to fact that there was a coordinated policing effort headed by the MPD, which began several months before the FTAA meetings. Also as evidence of a conspiracy, Plaintiffs point to the slide show briefing and to the coordinated activities on the day of the FTAA summit (*e.g.,* police march lines), which could not have been a "spontaneous occurrence." (Resp. 11.)

■ Plaintiffs fail to present a genuine issue of material fact of a civil conspiracy for trial. As stated above, the Court does not find that the slide show is evidence of an intent to deprive FTAA protestors their constitutional rights. Rather, it shows that the MPD recognized that 98% of the demonstrators were likely to be peaceful and that one of its responsibilities at the FTAA meetings is to protect the civil liberties of law-abiding demonstrators. Further, the fact that the City coordinated policing efforts between its police department and the police departments of other municipalities does not tend to show that they all agreed on an illegal objective, or that their agreement to coordinate is what caused Plaintiffs' injuries. Therefore, the

Court finds that Defendants are entitled to summary judgment on Counts 9 and 10.

## III. Supervisory Liability Claims

Counts 12, 13, and 15 are brought pursuant to 42 U.S.C. § 1983 against Chief Timoney, Deputy Chief Fernandez, and Captain Cannon on the basis of supervisory liability. In Counts 12 and 13, Plaintiffs allege that these individual defendants directed acts that violated Plaintiffs' First and Fourth Amendment rights. In Count 15, Plaintiff Lee individually alleges that Chief Timoney, Deputy Chief Fernandez, and Captain Cannon failed to intervene and countermand the orders that proximately caused her Fourth Amendment violations. In their Motion for Summary Judgment, Defendants argue that they are entitled to judgment as a matter of law on the basis of qualified immunity and because there is no evidence drawing the necessary connection between any act on their part and Plaintiffs' alleged constitutional violations.

■■■■■ "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.2003) (internal quotations and citations omitted). Instead, a supervisor is only personally liable under § 1983 when (i) he personally participates in the alleged constitutional violation, or (ii) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. *Cottone*, 326 F.3d at 1360. The necessary causal connection can be established by facts supporting an inference that a supervisor either directed the unlawful acts or knew that his subordinates were going to act unlawfully and failed to stop them from doing so. *Id.* "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a

subordinate is extremely rigorous." *Id.* at 1360–61 (citing *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003)).

Plaintiffs do not appear to argue that Chief Timoney, Deputy Chief Fernandez, or Captain Cannon personally participated in their constitutional violations. Instead, Plaintiffs argue that the individual defendants are liable as supervisors because they directed unlawful acts and failed to stop their subordinate's unlawful acts. (Response at 13.) The Court finds, however, that Plaintiffs have failed to draw the necessary causal connection between the individual defendants' conduct and *Plaintiffs'* injuries.

■■■■ Plaintiffs claim certain injuries that arose from police conduct occurring *before* the police line advanced on Biscayne Boulevard in the late afternoon of November 20, 2003. These include, but are not limited to, (i) the lock down of the Bayfront Park Amphitheater, (ii) police intimidation of those inside the amphitheater, (iii) the road blocks that prevented seniors from reaching the Bayfront Park Amphitheater, (iv) the helicopters that flew overhead and interrupted Plaintiffs' programming, (v) the police who turned away possible attendees of the AFL–CIO's rally, and (vi) the abbreviated route for the AFL–CIO march. Even if these injuries constitute constitutional violations, Plaintiffs do not point to any evidence tending to show that Chief Timoney, Deputy Chief Fernandez, or Captain Cannon are liable because they personally participated in the police activity that caused these particular constitutional violations, or that the individual defendants directed the police who were involved to act unlawfully. Nor do Plaintiffs point to any evidence that Chief Timoney, Deputy Chief Fernandez, or Captain Cannon knew that the police were going to cause the alleged violations and failed to intervene. Conse-

quently, Plaintiffs have failed to draw the necessary causal connection between the unidentified police who acted unlawfully and the individual defendants' supervision of those police.

■ Instead, Plaintiffs point only to the following facts in support of a finding of supervisory liability: (i) Chief Timoney was in "the mix all day" and in the vicinity of the police line in the late afternoon of November 20, 2003; (ii) Deputy Chief Fernandez gave the order for the police line to being moving north on Biscayne Boulevard in the late afternoon of November 20, 2003; and (iii) Captain Cannon gave the order to discharge less lethal munitions into the crowd in the late afternoon of November 20, 2003. (Response 12.) Plaintiffs do not adduce, however, any evidence that *their* constitutional rights were violated by the advancing police line on Biscayne Boulevard that late afternoon. The AFL–CIO march had concluded by that time, and there was no evidence that Plaintiffs scheduled additional programming for after the march, or that any such additional programming had been affected by the advancing police line on Biscayne Boulevard. Additionally, there is no evidence that AFL–CIO or FLARA members were protesting on Biscayne Boulevard at that time.

Instead, the record shows that Plaintiffs and other march participants dispersed after the AFL–CIO march. Cavanaugh and Dion then observed the police line advancing on Biscayne Boulevard and retreated to the Bayfront Park Amphitheater, where they were locked-down for a couple of hours. There is no evidence Chief Timoney, Deputy Chief Fernandez, or Captain Cannon participated in this lock-down, or that it was done at their direction. Acuff also attempted to retreat into the Bayfront Park Amphitheater after the march, but was pinned by police outside the amphitheater. Again, there is no evidence Chief Timoney, Deputy Chief Fernandez, or Captain Cannon pinned Acuff, or that police pinned Acuff at their direction. Finally, Lee returned to her hotel after the march. Sometime later, she was "milling around" with "other bystanders" when the police line advanced north on Biscayne Boulevard. Before the police line reached her, however, she retreated down a side street. These facts do not suggest that the police line on Biscayne Boulevard "seized" Lee, or that she was prevented from engaging in any expressive activity.[7] While the video footage of that afternoon shows a police line advancing and shooting less lethal weapons at protestors at Biscayne Boulevard, Plaintiffs do not present any evidence that connects that police activity, which individual defendants supervised, to a constitutional injury suffered by Plaintiffs.

The Eleventh Circuit has stated that the standard for holding supervisors liable is

***

**7.** Plaintiffs cite *City of Chicago v. Morales*, 527 U.S. 41, 54, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), for the proposition that the right to remain in a place of one's choosing is protected by the First Amendment. (Response at 13.) *Morales* involved a question of whether a loitering ordinance was constitutional, and the Supreme Court held the freedom to remain in a place of one's choosing is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment. 527 U.S. at 53–54, 119 S.Ct. 1849. Plaintiffs' supervisory liability claims, however, are not brought under the Fourteenth Amendment.

Additionally, with regards to the police activity on the side street that Lee found herself on after leaving Biscayne Boulevard, Plaintiffs do not present evidence that tends to show that the individual defendants were on that side street or that they had directed the police on that side street to act unlawfully. Consequently, Plaintiffs have failed to draw the causal connection between the police activity on the side street and the individual defendants' supervision of those police.

an "extremely rigorous" one, and Plaintiffs have not produced any facts tending to show that Chief Timoney, Deputy Chief Fernandez, or Captain Cannon directed their subordinates to act unlawfully and that those unlawful acts caused Plaintiffs' specific injuries. *See Post v. City of Fort Lauderdale,* 7 F.3d 1552 (11th Cir.1993) (finding that defendants were at least entitled to qualified immunity on plaintiffs' supervisory liability claims where there was no evidence that the defendant of direction to act *unlawfully* ). Nor have Plaintiffs presented a genuine issue of material fact that the individual defendants knew the police would act unlawfully and failed to stop them from doing so. Without any such evidence supporting the necessary causal connection between the individual defendants' conduct as supervisors and Plaintiffs' injuries, there are no material issues of fact for trial as to Chief Timoney, Deputy Chief Fernandez, or Captain Cannon's liability as supervisors.[8] Accordingly, the Court grants summary judgment in favor of the Defendants as to Counts 12, 13, and 15.

## IV. State Law Claims

Having dismissed Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' six remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that district court may decline to exercise supplemental jurisdiction when claims giving rise to original jurisdiction have been dismissed).[9] Accordingly, Counts 17, 18, 20, 22, 23, and 25 are dismissed without prejudice.

8. Because the Court finds that there are no genuine issues of material fact as to supervisory liability, the Court need not discuss whether the individual defendants are immune from suit.

## CONCLUSION

ORDERED AND ADJUDGED that Defendants' Amended Motion for Final Summary Judgment (D.E. 221) is GRANTED IN PART AND DENIED IN PART. Summary judgment in favor of Defendants is GRANTED as to Counts 1, 3, 4, 6, 8, 9, 10, 11, 12, 13, and 15 only.

ORDERED AND ADJUDGED that pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over the remaining state law claims and Counts 17, 18, 20, 22, 23, and 25 are DISMISSED WITHOUT PREJUDICE.

9. As set forth in 28 U.S.C. § 1367(d), the period of limitations for these claims are tolled "for a period of 30 days after [they are] dismissed unless State law provides for a longer tolling period."