[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 14, 2002
THOMAS K. KAHN
CLERK

----------------------
No. 00-16086
----------------------
D. C. Docket No. 99-0517-CV-UUB

LILIANA CUESTA,

Plaintiff-Appellant,

versus

SCHOOL BOARD OF MIAMI-DADE COUNTY,
FLORIDA, MICHAEL ALEXANDER, MIAMI-DADE COUNTY,

Defendants-Appellees.

-----------------------
Appeal from the United States District Court
for the Southern District of Florida
-----------------------
**(March 14, 2002)**

Before CARNES, BARKETT and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

In this appeal, we consider two issues: whether a school board is liable for an allegedly unlawful arrest stemming from a "zero tolerance" policy towards school related violent crime and whether a county is liable for an allegedly unconstitutional strip search of the arrestee. With respect to the first issue, we conclude that a school board cannot be held liable for allegedly unlawful arrests that result from a policy that merely calls on school officials to report criminal behavior. With respect to the second issue, we conclude that there was reasonable suspicion to strip search the arrestee, and therefore the search was constitutional. Accordingly, we affirm the district court's grant of summary judgment to both defendants.

I. BACKGROUND

On the morning of February 20, 1998, Liliana Cuesta and eight other students at Killian Senior High School distributed an anonymous pamphlet, entitled "First Amendment," on school grounds. The pamphlet's cover featured a graphic of Timothy Dawson, the school's principal, with a dart through his head. The pamphlet included several poems, cartoons and essays. Among the essays was one in which the author "wondered what would happen" if he shot the

2

principal, the school's teachers, or other students.[1]  The same essay made reference to "an African disease" and "immigrants who can't talk a fucking word of English."  Cartoons in the pamphlet depicted violent and sexual activity.

The following Monday, Principal Dawson discovered the identities of the nine students who created and distributed the pamphlet and called them to his office.  Because he feared for his safety, Dawson requested that both Miami-Dade Police Officer John Galardi and Division of School Police Officer Michael Alexander assist with the questioning of the students.  Each of the students admitted having been involved in the production and distribution of the pamphlet. Dawson told the police officers that if any crime had been committed, he wished to prosecute as far as the law would allow.  After examining a book of Florida statutes, Officer Alexander concluded that the students had violated Fla. Stat. § 836.11, a misdemeanor that criminalizes the anonymous distribution of publications that "expose any individual or any religious group to hatred,

---

[1]The essay included the following language:

I have often wondered what would happen if I shot Dawson in the head and other teachers who have pissed me off or shot the fucking bastard who thought I looked at him wrong or the airheaded cheerleader who is more concerned about what added layer of Revlon she's putting on instead of the fact that she's blocking my path or, I would shoot (twice) the fucking freshmen who think they're cool cuz they're in high school.

contempt, ridicule or obloquy."[2]  He also believed that, given the racially

motivated content of the pamphlet, the crime could be enhanced to a felony under

Fla. Stat. § 775.085, a law that allows the enhancement of a crime that "evidences

prejudice."[3]  Alexander spoke with an Assistant State Attorney on the telephone,

who conferred with colleagues and agreed that there was probable cause to arrest

under § 836.11 and that the crime could be enhanced to a felony under § 775.085.

The students were arrested and transported to either the Juvenile Assessment

Center or the Turner Guilford Knight Correctional Facility ("TGK"), depending on

whether they were over eighteen years old.

---

[2] The relevant portion of § 836.11 states:

> It shall be unlawful to print, publish, distribute or cause to be printed, published
> or distributed by any means, or in any manner whatsoever, any publication,
> handbill, dodger, circular, booklet, pamphlet, leaflet, card, sticker, periodical,
> literature, paper or other printed material which tends to expose any individual or
> any religious group to hatred, contempt, ridicule or obloquy unless [the name and
> address of those responsible for the publication] is clearly printed or written
> thereon.

Fla. Stat. Ann. § 836.11 (West 2001).

[3]The relevant portion of § 775.085 states:

> The penalty for any felony or misdemeanor shall be reclassified as provided in
> this subsection if the commission of such felony or misdemeanor evidences
> prejudice based on the race, color, ancestry, ethnicity, religion, sexual orientation,
> national origin, mental or physical disability, or advanced age of the victim:
> ****
> 2.  A misdemeanor of the first degree is reclassified to a felony of the third
> degree.

Fla. Stat. Ann. § 775.085 (West 2001).

Cuesta, who was over eighteen years old, was taken to TGK. Cuesta was booked and strip searched pursuant to a Metro-Dade County policy requiring the strip search of all newly arrested felons. The strip search, conducted by a female corrections officer in a closed room, required Cuesta to completely disrobe; to lift her breasts exposing the area underneath; and to squat down and cough while exposing her buttocks. After the strip search was completed, Cuesta was placed in a holding cell with several other women until she was released on bond.

Four days after the arrests, the State Attorney's Office decided not to prosecute any of the students who had participated in creating and distributing the pamphlet. The State Attorney issued a press release indicating that the decision not to file criminal charges was made because "recent decisions of the United States Supreme Court . . . render the statute in question unconstitutional and unenforceable." In an unrelated case, the Florida Fourth District Court of Appeal later declared § 836.11 to be an unconstitutional infringement of the First Amendment. Florida v. Shank, 795 So.2d 1067 (Fla. Dist. Ct. App. 2001).

Cuesta subsequently filed this action under 42 U.S.C. § 1983 against: (1) The Dade County School Board and Police Officer Michael Alexander, for violating her First and Fourth Amendment rights by unlawfully arresting her; and (2) Miami Dade County, for violating her Fourth Amendment rights by subjecting

5

her to an unconstitutional strip search. The district court granted a motion to dismiss by Officer Alexander based on qualified immunity; that decision has not been appealed. The district court then granted summary judgment for both the County and the School Board. Cuesta appeals those grants of summary judgment.

## II. DISCUSSION

Summary judgment is granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). This court reviews the grant of summary judgment de novo, applying the same legal standards as the district court. Wolf v. Coca-Cola Co., 200 F.3d 1337, 1339 (11th Cir. 2000). We construe the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Arrington v. Cobb County, 139 F.3d 865, 871 (11th Cir. 1998).

*A. The Arrest*

A local government body, such as the School Board in this case, is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

6

official policy, inflicts the injury . . . ." Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978).  A plaintiff can establish § 1983 liability by identifying that she has been deprived of constitutional rights by either an express policy or a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom and usage with the force of law."  Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (internal quotes omitted) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)).  Cuesta asserts that both the express policy and the custom of the County were responsible for her alleged constitutional deprivations.[4]

It is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation.  The "official policy or custom must be the moving force of the constitutional violation in order to establish liability of a government body under § 1983."  Gilmere v. City of Atlanta, Ga., 737 F.2d 894, 901 (11th Cir. 1984) (internal quotes omitted).  A plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Bd. of the

---

[4] Cuesta also claims that the School Board should be held liable for the police officer's arrest under a theory of respondeat superior, but this argument is foreclosed by the Supreme Court's decision in Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978) ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.").

County Comm'rs v. Brown, 520 U.S. 397, 404 (1997). Cuesta asserts that the

"zero tolerance" policy of the School Board was the "moving force" behind her

allegedly unconstitutional arrest. A fair reading of the School Board Rules ("the

Rules"), however, reveals that they were not the "moving force" behind her arrest.[5]

The zero tolerance policy is made up of three provisions of the School Board

Rules ("the Rules") and is supplemented by the Code of Student Conduct. Under

the Rules, School Police are responsible for "providing assistance" in "[t]he

prevention and detection of crime and the enforcement of the penal laws of this

state as the violation occurs on or to the properties of the Dade County Public

Schools." School Board Rule 6Gx13-4A-1.09 (Division of School

Police–Organization and Responsibilities). The Rules also state that "[a]ll

employees are under an affirmative duty to report any criminal act, and/or

disruptive, and/or inappropriate behavior. . . . All violations of law and incidents of

disruptive and/or inappropriate behavior are to be reported in accordance with

---

[5] It is unclear whether the School Board would be liable even if its policy was the "moving force" behind Cuesta's arrest, because § 836.11 was valid law at the time of the arrest. The "subsequently determined invalidity of [a statute] on vagueness grounds does not undermine the validity of the arrest made for violation of that [statute]. Michigan v. DeFillippo, 443 U.S. 31, 40 (1979). The Supreme Court has stated that "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality–with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." Id. at 38. Because we hold that the School Board's policy was not the moving force behind the arrest, there is no need for us to address whether § 836.11 was "grossly and flagrantly unconstitutional."

administrative procedures established by the Superintendent of Schools." School Board Rule 6Gx13-4A-1.21.III, IV (Responsibilities and Duties). Finally, the Rules state that "[t]he Board endorses a zero tolerance policy toward school related violent crime." School Board Rule 6Gx13-5D-1.08 (Maintenance of Appropriate Student Behavior). The rule endorsing the zero tolerance policy incorporates the Code of Student Conduct by reference. The Code of Student Conduct describes the zero tolerance policy as requiring "school districts to invoke the most severe consequences provided for in the Code of Student Conduct in dealing with students who engage in violent criminal acts . . ." Code of Student Conduct Secondary i (1997). The consequences provided for in the Code of Student Conduct direct individuals to "[r]efer criminal acts to the Miami-Dade County Public Schools Police and the local police agency for appropriate legal action." Id. at 10-13. We do not construe these Rules to be the "moving force" behind Cuesta's arrest; rather, the Rules merely call on school officials to report criminal behavior.

We also do not find that the School Board had a custom that was the "moving force" behind Cuesta's arrest. According to Cuesta, School Board Police officers had a widespread customary practice of making arrests for all serious on-campus crimes, and therefore the policy that mandates the reporting of criminal behavior directly caused Cuesta's arrest. The facts of this case demonstrate

9

otherwise. Principal Dawson reported the students' conduct to Officer Alexander, as is mandated under the policy. He also indicated that he wished to prosecute the students if they had violated any criminal laws. Officer Alexander, together with Officer Galardi, looked through a book of statutes and found § 836.11. Officer Alexander then called the State Attorney's Office and spoke with Assistant State Attorney Carlos Guzman about the possibility of making an arrest under § 836.11, and the possibility of enhancing the crime under §775.085. Guzman discussed the situation with two colleagues at the State Attorney's Office, and the three of them concluded that there was probable cause to make an arrest, and that the crime could be enhanced. Only after Guzman conveyed this conclusion to Officer Alexander was an arrest made. Thus, the facts of Cuesta's arrest demonstrate that reports of serious crimes do not automatically lead to arrest–two police officers and three Assistant State's Attorneys considered whether to arrest the students after the conduct was reported. The statistics in the record also indicate that the school police officers exercised independent judgment before arresting. For the school year in which Cuesta was arrested, police officers only made arrests in 14.91% of the incidents reported to them. We therefore perceive no custom leading to Cuesta's allegedly unlawful arrest.

Even in the absence of an express policy or custom, a local government body can be held liable "for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision." See McMillian v. Johnson, 88 F.3d 1573, 1577 (11th Cir. 1996). Cuesta argues that Principal Dawson was such a final policymaker, and therefore the School Board can be held liable for her allegedly unlawful arrest. It is clear from the record, however, that Dawson has no final policymaking authority to make arrests. As discussed earlier, the decision to arrest was made by Officer Alexander after consultation with the State Attorney's Office. Therefore, the School Board can not be held liable for any constitutional deprivation that might have occurred as a result of Cuesta's arrest.

*B. The Strip Search*

In Bell v. Wolfish, 441 U.S. 520 (1978), the Supreme Court concluded that strip and visual body cavity searches of arrestees can be constitutionally conducted with less than probable cause. Id. at 560. The Court recognized that "a detention facility is a unique place fraught with serious security dangers." Id. at 559. As a result, the Court reasoned that "there must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.'" Id. at 546 (quoting Wolff v. McDonnell, 418 U.S. 539, 556

11

(1974)). To assist courts in determining the reasonableness of searches, Bell gives

the following balancing test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it was conducted.

Id. at 559. Cuesta argues that her search was not justified and therefore violated

her Fourth Amendment rights[6] –she does not challenge the constitutionality of the

scope, place, or manner of her strip search.

This court has explained the "justification" prong of the Bell decision in two

recent cases: Skurstenis v. Jones, 236 F.3d 678 (11th Cir. 2000) and Wilson v.

Jones, 251 F.3d 1340 (11th Cir. 2001). Both cases make clear that the Fourth

Amendment requires jail officials to have "reasonable suspicion" that an arrestee is

concealing weapons or contraband before they can perform a strip search. If jail

officials have reasonable suspicion that an arrestee is concealing weapons or

---

[6]The County argues that the search should be analyzed under the Due Process Clause of the Fourteenth Amendment. Under the law of this circuit, however, a strip search performed without reasonable suspicion violates the Fourth Amendment rights of the individual searched. See Wilson v. Jones, 251 F.3d 1340, 1343 (11th Cir. 2001). Because Cuesta's § 1983 action alleges that her Fourth Amendment rights were violated, this opinion will examine her rights under that constitutional amendment.

12

contraband, then they do not infringe on her constitutional rights by conducting a strip search.

In Skurstenis, the plaintiff was arrested for driving under the influence. While being booked into jail, she was strip searched pursuant to a jail policy requiring that all arrestees be strip searched before being placed in a cell or detention room.  Skurstenis brought a § 1983 action, complaining that the strip search violated her rights under the Fourth Amendment.  This court held that Skurstenis's constitutional rights were not violated because there was reasonable suspicion to search her based upon the fact that she had a handgun in the floorboard of her car when she was arrested.  Skurstenis, 236 F.3d at 682.  In dicta, the Skurstenis court addressed the jail's mandatory search policy by noting that "[t]his policy, which does not require any reasonable suspicion, does not comport with the requirements of the Fourth Amendment."  Id.

In Wilson, we made the dicta of Skurstenis binding law.  The plaintiff in Wilson was also arrested for driving under the influence and strip searched pursuant to the same jail's policy.  The court distinguished the case from Skurstenis by noting that "unlike Skurstenis, there is no evidence that the officers at Shelby County Jail had reasonable suspicion that Wilson was concealing weapons or any other type of contraband."  Wilson, 251 F.3d at 1343.  The Wilson

court therefore held that the jail policy of searching all arrestees violated the Fourth Amendment. Id.

In this case, we hold that Cuesta's constitutional rights were not violated because TGK officers had reasonable suspicion to search based upon the violent and threatening language and imagery contained in the pamphlet.[7] The record makes evident that TGK personnel knew about the violent contents of the pamphlet. The arrest affidavit indicated to TGK officials that Cuesta had been charged with both "Distributing Unlawful Hate Publication" and "Hate Crime Enhancement." The narrative on the arrest affidavit indicated that "THE PAMPHLET CONTAINED 'HATE CRIME' REMARKS DIRECTED TOWARD THE (BLACK) PRINCIPAL AND NON ENGLISH SPEAKING IMMIGRANTS. THE PAMPHLET REFERED [sic] TO 'SHOOTING DAWSON IN THE HEAD' AND THE 'AFRICAN DISEASE.'" TGK officers also were made aware of the pamphlet's content by Officer Galardi, the Miami-Dade Police Officer who transported Cuesta to TGK. Galardi indicated in his deposition that he spent

---

[7] The County argues that reasonable suspicion was also provided, in part, by the fact that one of the other students involved in creating and distributing the pamphlet voluntarily turned over a small knife prior to being transported. The County provides no support in the record for this claim, and we have been unable to locate this fact in an independent search of the record. We therefore will not consider it on review. See Welch v. Celotex Corp., 951 F.2d 1235, 1237 n.3 (11th Cir. 1992) ("Upon review of a grant by a district court of a motion for summary judgment, a federal appellate court may examine only the evidence which was before the district court when the latter decided the motion for summary judgment.").

"[r]oughly an hour, forty-five minutes" attending to Cuesta's booking. Cuesta similarly stated in her deposition that Officer Galardi spoke with the booking agents about her for approximately twenty minutes before she was taken to be strip searched.

Cuesta argues that the County failed to introduce evidence that anyone at TGK actually knew the contents of the pamphlet at the time she was searched, and therefore summary judgment should not have been granted for the County. It is true that on a motion for summary judgment, all reasonable inferences must be made in favor of the non-moving party. Arrington, 139 F.3d at 871 (11th Cir. 1998). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S 574, 592 (1986). In this case, it is implausible to believe that TGK personnel did not know about the violent and hateful language contained in the pamphlet, given the contents of the arrest affidavit and their lengthy discussion with Officer Galardi.[8]

---

[8] Because we hold that Cuesta suffered no deprivation of her constitutional rights, we need not decide the question of whether the County's policy, in which all felony arrestees are strip searched, might deprive others of their constitutional rights. See City of Los Angeles v. Heller, 475 U.S. 796, 811 (1986); Rooney v. Watson, 101 F.3d 1378, 1381-82 (11th Cir. 1996)

15

Cuesta's argument also fails because in a § 1983 action, the plaintiff bears the burden of persuasion on every element.  See, e.g., Miller v. Taylor, 877 F.2d 469, 472 (6th Cir. 1989) (plaintiff in § 1983 excessive force action had burden of proving that force was excessive);  Edwards v. Philadelphia, 860 F.2d 568, 572 (3d. Cir. 1988) (same);  Davis v. Lane, 814 F.2d 397, 401 (7th Cir. 1987) (prisoner alleging Eighth Amendment violation bore burden of proving every element, including that guard acted without justification).  Because Cuesta alleges that she was searched without reasonable suspicion, it is her burden to show that the County lacked reasonable suspicion to search her.  Armington v. Sch. Dist. of Philadelphia, 767 F. Supp. 661, 667 (E.D. Pa. 1991) ("In a § 1983 action plaintiff has the burden of proving that defendant lacked reasonable suspicion.").  Cuesta failed to produce any evidence indicating that the TGK personnel lacked reasonable suspicion that she was concealing weapons or contraband.  Therefore, Cuesta's claim that her constitutional rights were violated by the strip search fails as a matter of law.

III.  CONCLUSION

("[O]ur finding that the Rooneys did not suffer any constitutional deprivation makes it unnecessary to consider Volusia County's policy or custom.").

16

For the reasons stated above, the district court's grants of summary judgment to both the County and the School Board are AFFIRMED.