[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-14992
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 5, 2011
JOHN LEY
CLERK

D. C. Docket No. 07-22966-CV-UU

AMERICAN FEDERATION OF LABOR AND CONGRESS
OF INDUSTRIAL ORGANIZATIONS,
FLORIDA ALLIANCE OF RETIRED AMERICANS,
THEA LEE,
DEBORAH DION,
MICHAEL CAVANAUGH,
STEWART ACUFF,

Plaintiffs-Appellants,

versus

CITY OF MIAMI, FL,
JOHN TIMONEY, in his
individual capacity,
FRANK FERNANDEZ, in his
individual capacity,
THOMAS CANNON, in his
individual capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 5, 2011)

Before CARNES, KRAVITCH and SILER,[*] Circuit Judges.

KRAVITCH, Circuit Judge:

The American Federation of Labor and Congress of Industrial Organizations (AFL–CIO), the Florida Alliance of Retired Americans (FLARA), and several employees of the AFL–CIO sued the City of Miami and several of its police officers under 42 U.S.C. § 1983. The plaintiffs sought damages, as well as declaratory and injunctive relief. The district court held that the plaintiffs lacked standing to pursue their claims for declaratory and injunctive relief and dismissed those claims, as well as claims that the defendants had violated their Fourteenth Amendment rights. The district court later rendered summary judgment in favor of the defendants on the remaining claims. The plaintiffs appealed. After a thorough review of the record and oral argument, we conclude that the plaintiffs have failed to present genuine issues of material fact on essential elements of their claims, that their claims for declaratory and injunctive relief are moot, and that

_____

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

their claims for violation of their Fourteenth Amendment rights were properly dismissed. Accordingly, we affirm the judgment of the district court.

I.

In November 2003, Miami hosted a meeting of ministers, leaders, and diplomats who were negotiating an agreement to establish the Free Trade Area of the Americas (FTAA). A number of organizations and individuals also came to Miami to protest the FTAA. Among the protestors and organizations were the plaintiffs in this case: the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO), the Florida Alliance of Retired Americans (FLARA), and several employees of the AFL–CIO: Stewart Acuff, Michael Cavanaugh, Deborah Dion, and Thea Lee.

To protest the FTAA, the AFL–CIO planned a number of events, ranging from galas and forums to marches and rallies. The AFL–CIO also contacted organizations who were likewise opposed to the FTAA to solicit their support and encourage their participation in the AFL–CIO's activities in Miami. Throughout the planning, the AFL–CIO negotiated with the City of Miami and the Miami Police Department (MPD) to secure the proper permits for its events, to discuss possible routes for its planned march, and to ensure cooperation between the police and protestors. On this last point, the AFL–CIO repeatedly affirmed its

3

commitment to conduct lawful and peaceful demonstrations. But both the AFL–CIO and the MPD recognized that some protestors might not be as committed to lawful, peaceful protests as the AFL–CIO. The AFL–CIO reached out to some groups who were planning acts of civil disobedience and asked them not to disrupt the AFL–CIO's planned activities. The police prepared as well, by enlisting the aid of other law-enforcement agencies in South Florida and training to deal with large crowds of protestors. But despite extensive planning by the City of Miami, the MPD, the AFL–CIO, FLARA, and many other protestors, what most had hoped would be peaceful protests did not turn out as planned.

Thursday, November 20, 2003, was expected to be the high point of the AFL–CIO's protests against the FTAA but it quickly turned into the protest's nadir. The organization's rally at the Bayfront Park Amphitheater was fraught with problems. The AFL–CIO had coordinated with FLARA to bus in a number of retired Floridians to attend the rally. Because the police diverted traffic on Biscayne Boulevard, many of the busloads of retirees were dropped off far from the amphitheater. A few other buses were directed by the Florida Highway Patrol to turn around and, as a result, never arrived. The AFL–CIO also held a protest march on Thursday. But the march did not follow the planned route; it did not pass the hotel where the ministers were convened.

But these incidents were relatively mild compared with some of the other mishaps that day. For example, police officers drew guns on AFL–CIO employees Deborah Dion and Michael Cavanaugh, while the two staffers were trying to leave the amphitheater. Also, a number of protestors were confined in the amphitheater during the afternoon while police, in full riot gear, marched down Biscayne Boulevard attempting to disperse a crowd of protestors. Thea Lee, another AFL–CIO employee, was caught up in that crowd and she was exposed to a pepper-based chemical irritant.

As a result of these incidents, the plaintiffs sued the City of Miami and several members of the MPD, John Timoney, then the chief of police, Frank Fernandez, then a deputy chief of police, and Thomas Cannon, then a police major. The plaintiffs contend that the defendants deprived them of their constitutional rights under color of state law. *See* 42 U.S.C. § 1983. The plaintiffs surmise that these deprivations occurred because the City of Miami was hostile towards their anti-FTAA viewpoint, and sought to quell dissent over the proposal because the FTAA would benefit Miami economically.

In Counts 1, 6, and 11 of the complaint, the plaintiffs allege that the City of Miami adopted municipal policies that directly caused violations of their First, Fourth, and Fourteenth Amendment rights. Similarly, in Counts 3 and 8, the

plaintiffs contend that the City of Miami is liable because Timoney, an official policy maker, adopted municipal policies that directly caused violations of their First and Fourth Amendment rights.  In Count 5, the plaintiffs seek to hold the City of Miami liable for failing to train its employees, which caused the plaintiffs' First, Fourth, and Fourteenth Amendment rights to be violated.  In Count 10, the plaintiffs allege that Timoney, Fernandez, and Cannon conspired together to violate their civil rights.  In Counts 12 and 13, the plaintiffs contend that Timoney, Fernandez, and Cannon failed to intervene to prevent violations of their First and Fourth Amendment rights.  In Count 15, Thea Lee alleges that Timoney, Fernandez, and Cannon ordered their subordinates to act in a manner that violated her Fourth Amendment rights.  The district court rendered summary judgment in favor of the defendants on these claims.

In Count 16, the plaintiffs sought to hold Timoney, Fernandez, and Cannon liable for violating their Fourteenth Amendment rights.  That count was dismissed by the district court because it concluded that the officers were entitled to qualified immunity.  The AFL–CIO also sought declaratory and injunctive relief against the City of Miami to prevent future use of the operational plan developed by the MPD for the FTAA meeting. The district court dismissed that count because it concluded that the AFL–CIO lacked standing.

The plaintiffs' issues on appeal fall into two broad categories. The first category concerns whether summary judgment was inappropriate because there were genuine issues of material fact. The second is whether the district court erred in granting the defendants' motion to dismiss. Because an issue within the second category presents a jurisdictional question, we address it and the other issues regarding the motion to dismiss first. We then turn to the plaintiffs' remaining claims to determine whether summary judgment was appropriate.

II.

We review an order granting a motion to dismiss *de novo*. *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1176 (11th Cir. 2009). And we accept as true all of the plaintiffs' well-pleaded allegations. *Id.*

A. *Claims for declaratory and injunctive relief*

In its complaint, the AFL–CIO asked for declaratory and injunctive relief against the City of Miami and the MPD to prevent them from using the operational plan that was employed during the FTAA meeting. To support its claim for injunctive relief, the AFL–CIO alleged that it

> continues to be present and express its views in connection with meetings and forums similar to the FTAA summit that will occur throughout the United States, and which are likely to recur in South Florida; and [the] AFL–CIO expects and intends to sponsor[,] participate[, or both] in public assemblies and demonstrations in South Florida and elsewhere during the months leading up to the November 2008 elections.

7

The district court granted the defendants' motion to dismiss the AFL–CIO's claim for injunctive relief, because it concluded that the AFL–CIO lacked standing as it had failed to allege a real and immediate threat of future injury. *See Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) ("[A] prayer for injunctive and declaratory relief requires an assessment . . . of whether the plaintiff has sufficiently shown a real and immediate threat of future harm."). Before we can consider whether the district court erred in dismissing this claim, we must first determine whether we have subject-matter jurisdiction.

"On every writ of error or appeal, the first and fundamental question is that of jurisdiction . . . ." *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900). Article III of the Constitution limits the judicial power, and consequently our jurisdiction, to cases and controversies. One requirement for jurisdiction is that an actual controversy exist throughout the entire litigation. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). Although neither the appellants nor the appellees raised the issue of mootness in their briefs, we are nonetheless obligated to consider the matter. *Id.* at 73. In order to determine whether the controversy is moot, we need only to consider the plaintiffs' complaint, as this is not a factual challenge to subject-matter jurisdiction. *Cf. Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

8

We conclude that the AFL–CIO's request for declaratory and injunctive relief no longer presents a justiciable controversy. The only specific allegation the AFL–CIO made about its future-protest plans involved demonstrations that it planned to hold in the months leading up to the November 2008 elections. But those elections have since passed, and the AFL–CIO did not allege when and where it intended to engage in activities that could subject it to the FTAA operational plan beyond November 2008. Because Article III limits our jurisdiction to "actual, *ongoing* controversies" and this controversy is no longer ongoing, we are without jurisdiction to consider the plaintiffs' argument that the district court erred by granting the defendants' motion to dismiss the AFL–CIO's claims for declaratory and injunctive relief. *Honig v. Doe*, 484 U.S. 305, 317 (1988) (emphasis added).

B. *Count 16: The individual plaintiffs' § 1983 claim for violation of Fourteenth Amendment rights*

In addition to dismissing the AFL–CIO's claim for declaratory and injunctive relief, the district court also dismissed Count 16, the plaintiffs' § 1983 claim for violation of their Fourteenth Amendment rights, because it concluded that the individual defendants were entitled to qualified immunity. A government official is entitled to qualified immunity if, under the facts as alleged, his conduct did not violate a clearly established statutory or constitutional right of which a

9

reasonable person would have known. *Amnesty Int'l,* 559 F.3d at 1181. The dismissal was premised on the district court's conclusion that the facts, as alleged, did not establish that the defendants violated the plaintiffs' Fourteenth Amendment rights.

The Fourteenth Amendment protects two type of due process: substantive and procedural due process. It is through substantive due process that many of the rights enumerated in the Constitution have been applied to the states. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3093 (2010) (Stevens, J., dissenting). But substantive due process does still more, as it also prohibits governmental action that "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998).

In its qualified-immunity analysis, the district court used the "shock the conscience" standard to determine whether the defendants' alleged conduct violated the plaintiffs' constitutional rights. Most of the actions the plaintiffs allege, however, are specifically protected by amendments other than the Fourteenth,[1] which is the mechanism that affords the plaintiffs the protection of those other amendments against the states. Accordingly, the district court should

---

[1] This count of the plaintiffs' complaint actually contains several different claims, but the problem with the district court's qualified-immunity analysis is common to all of the claims in Count 16.

10

have conducted a qualified-immunity analysis using those amendments as its guide. *Lewis*, 523 U.S. at 842 ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (Rehnquist, C.J.)); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989). But the district court's error was harmless: the plaintiffs made (nearly) identical claims under the specific amendments that applied to the alleged conduct, which the district court did not dismiss.

*C.  Count 16: The organizational plaintiffs' § 1983 claim for violation of Fourteenth Amendment rights*

In Count 16, the AFL–CIO and FLARA allege that the individual defendants deprived them of property without due process, in violation of the Fourteenth Amendment, by: (1) harassing and assaulting people seeking to enter the Bayfront Amphitheater, which had been rented by the AFL–CIO; (2) interfering with access to the Bayfront Amphitheater by the AFL–CIO's outside vendors; (3) blocking and diverting buses chartered by the AFL–CIO and FLARA; and (4) seizing and blocking access to other property of the AFL–CIO and FLARA.

As with the individual plaintiffs' claims, the district court used the

Fourteenth Amendment's shock-the-conscience standard to determine whether the defendants were entitled to qualified immunity from the AFL–CIO and FLARA's claims. But a claim for deprivation of property without due process under the Fourteenth Amendment is not one for violation of substantive due process; rather it is a claim for violation of procedural due process. *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir. 1991) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972)); *cf. Silva v. Bieluch*, 351 F.3d 1045, 1047 (11th Cir. 2003); *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (*en banc*) ("[A]reas in which substantive rights are created only by state law . . . are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.'") (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring)).

As the Supreme Court has said: "Procedural due process rules are not meant to protect persons from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate

12

process." *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)). Nowhere in the complaint does the AFL–CIO or FLARA allege how they were denied due process.

Although notice pleading does not require a plaintiff to specifically plead every element of his cause of action, a complaint must still contain enough information regarding the material elements of a cause of action to support recovery under some "viable legal theory." *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001). The plaintiffs have made conclusory statements that they were deprived of property without due process, but this is not even a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nothing in the complaint—directly, inferentially, or otherwise—says how Florida's procedures for recovering wrongfully taken property violated due process, or that the plaintiffs even attempted to use those procedures. Nor do the plaintiffs allege that the defendants' pre-deprivation procedures, if they were even required, were somehow inadequate. Given the absence of any information in the complaint about a material element of their claim, the plaintiffs have failed to state a claim upon which relief can be granted. We now turn to the plaintiffs' arguments about

13

summary judgment.

III.

We review a district court's order rendering summary judgment *de novo*. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). A party is entitled to summary judgment if, after an adequate time for discovery has passed, it can demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). No genuine issue of material fact exists if a party has failed to "make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The defendants moved for summary judgment on the ground that the plaintiffs had failed to adduce evidence establishing an element essential to each of their § 1983 claims. When there is a "complete failure of proof concerning an essential element on the nonmoving party's case," the motion for summary judgment should be granted. *Id.* at 323.

We now examine each of the plaintiffs' § 1983 claims to determine whether the plaintiffs brought forward evidence sufficient to create genuine issues of material fact that should have precluded the district court from rendering summary

14

judgment on behalf of the defendants.

*A. Claims against the City of Miami*

i. The Parade Ordinance, The Mutual Aid Agreement, and the Security Plan

A municipality may only be held liable under § 1983 when one of its policies causes a constitutional injury. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). A court's first inquiry in assessing municipal liability is whether there is a direct causal link between a municipal policy and the alleged constitutional injury. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "It is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation." *Cuesta v. Sch. Bd. of Miami-Dade Co.*, 285 F.3d 962, 967 (11th Cir. 2002). The policy must be the "moving force" behind the constitutional injury. *Id.* (quoting *Gilmere v. City of Atlanta*, 737 F.2d 894, 901 (11th Cir. 1984)). When a municipal policy itself violates federal law, or directs a municipality to do so, resolving "issues of fault and causation is straightforward." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). But when that is not the case, determining causation is more difficult. *Id.* at 406. If a facially-lawful municipal action is alleged to have caused a municipal employee to violate a plaintiff's constitutional rights, the plaintiff must establish "that the municipal action was taken with 'deliberate indifference' as to its known or obvious

15

consequences." *Id.* at 407 (quoting *City of Canton*, 489 U.S. at 388). As none of the policies in question here are facially unconstitutional, this presents the plaintiffs with a difficult task.

Shortly before the FTAA summit, the Miami City Commission adopted an ordinance that restricted what materials could be carried during protests and parades. The City also contacted other law-enforcement agencies in South Florida and entered into mutual aid agreements with many of them to secure those organizations' assistance during the FTAA summit. The agreements also required that participating law-enforcement agencies abide by uniform rules of engagement during the FTAA summit.

In Counts 1, 6, and 11, the plaintiffs contend that these municipal policies, along with unwritten components of the MPD's security plan, directly caused their First, Fourth, and Fourteenth Amendment rights to be violated. In Count 3 and 8, the plaintiffs allege that Timoney, as an official policy maker for the City, adopted the Mutual Aid Agreement and Security Plan, and then ordered the acts that deprived the plaintiffs of their First and Fourth Amendment rights. The district court concluded that the plaintiffs had failed to proffer any evidence that either those policies adopted by the City or those implemented by Timoney caused the plaintiffs' constitutional injuries. *AFL–CIO v. City of Miami*, 650 F. Supp. 2d

16

1258, 1268–69, 1271–72 (S.D. Fla. 2009). The plaintiffs contend that the district court erred by viewing each policy in isolation, whereas, had the district court viewed the policies together it would have been clear that a genuine issue of material fact existed about whether the policies caused their constitutional injuries. The defendants respond that the plaintiffs have failed to bring forward any evidence establishing that that the City's municipal policies caused their constitutional injuries.

Regarding the counts against the City of Miami, we conclude that whether the municipal policies are viewed separately or together, the plaintiffs have failed to adduce any evidence that those policies caused their constitutional injuries and thus summary judgment was appropriate. First, we note that none of the policies are facially unconstitutional. Accordingly, to prevail on their claims, the plaintiffs would have to prove that City of Miami was deliberately indifferent to the known or obvious consequences of its policies. *See Brown*, 520 U.S. at 407; *see also James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009); *Oviatt v. Pearce*, 954 F.2d 1470, 1477–78 (9th Cir. 1992). The plaintiffs have failed to proffer any evidence that the City of Miami knew its policies would result in constitutional violations. Nor have they brought forward evidence that it was obvious such violations would occur.

17

What evidence there is suggests that the City was sensitive to the protestors' constitutional rights. For example, the City Commissioners patterned the parade ordinance after one that had sustained a constitutional challenge. The City also amended the parade ordinance to accommodate some protestors—a group of artists and puppeteers—who feared that they could be prosecuted for violating the ordinance.

The plaintiffs have also failed to provide any evidence suggesting that there were unwritten policies in the City's security plan to quell dissenting views. Finally, while it is true that the FTAA training slide show classifies protestors according to their ideology and perceived potential for violence, the plaintiffs have failed to adduce any evidence that the slide show was generated by an official policy maker, which means they have not adduced any evidence that the slide show represented a municipal policy. Accordingly, the slide show cannot be the basis for municipal liability. *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005).

We also conclude that the summary judgment was appropriate for Counts 3 and 8. All of the policies adopted by Timoney were facially lawful. And the plaintiffs have failed to produce any evidence that Timoney adopted those policies

18

with deliberate indifference to the fact they were certain to cause constitutional rights to be violated. *Brown*, 520 U.S. at 407.

ii. Failure to Train or Supervise

A municipality can also be held liable under § 1983 when its employees cause a constitutional injury as a result of the municipality's policy- or custom-based failure to adequately train or supervise its employees. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). But "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. To establish a municipality's "deliberate indifference," a plaintiff must put forward some evidence that the municipality was aware of the need to train or supervise its employees in a particular area. *Gold*, 151 F.3d at 1350–51.

Establishing notice of a need to train or supervise is difficult. A plaintiff may demonstrate notice by showing a "widespread pattern of prior abuse" or even a single earlier constitutional violation. *Gold*, 151 F.3d at 1351. But a plaintiff must also demonstrate that constitutional violations were likely to recur without training. *Id.* at 1352 n.12. In some cases, the need for training is so obvious that deliberate indifference can be established even without an earlier violation or

19

pattern of abuse. *Brown*, 520 U.S. at 409. Still, it must have been obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation. *Id.* In addition to notice, a plaintiff must also establish that the city "made a deliberate choice" not to train its employees. *Gold*, 151 F.3d at 1350.

The district court concluded that the plaintiffs failed to adduce any evidence that the City was on notice that it needed to improve police training on First and Fourth Amendment rights. *AFL–CIO*, 650 F. Supp. 2d at 1270. The plaintiffs contend two reports establish notice. One, authored by the City of Miami Civilian Investigative Panel (CIP), says that training on First and Fourth Amendment rights was noticeably absent from the MPD's FTAA training course. But to hold a municipality liable for failure to train it is not enough to show that the training was inadequate. *Gold*, 151 F.3d at 1350. The city must be on notice that the training was inadequate as well. The CIP report does not say the city was on notice that its First and Fourth Amendment training was deficient before the FTAA demonstration and because the report itself was written after the FTAA summit, it cannot be the basis for establishing notice itself. Accordingly, the district court was correct to conclude that the CIP report was not evidence that the City of

20

Miami was on notice that it needed to improve MPD's training on First and Fourth Amendment issues.

The second report cited by the plaintiffs is a March 2003 letter from the United States Department of Justice (DOJ), which details the preliminary findings of a DOJ investigation regarding use of force and use-of-force reporting by the MPD. That letter is certainly evidence that the City of Miami was on notice that its use-of-force policies and training needed improvement. But summary judgment was nonetheless appropriate. A plaintiff must present evidence not only that the municipality was on notice of a need to train but also that the municipality made a choice not to do so. *Id.* ("To establish . . . 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area *and* the municipality made a deliberate choice not to take any action.") (emphasis added). Because the plaintiffs failed to adduce evidence on that second point, summary judgment was appropriate.

*B. Claims against the individual defendants*

    i. Supervisory Liability Claims

Counts 12 and 13 concern events that occurred at the amphitheater and the plaintiffs' allegations that the individual defendants ordered their subordinates to act unlawfully—in violation of the First and Fourth Amendments—or that they

21

knew that their subordinates were acting unlawfully and they failed to intervene. Count 15 concerns police action on Biscayne Boulevard and Lee's allegation that the defendants ordered their subordinates to act unlawfully—in violation of the Fourth Amendment—or knew that their subordinates were acting unlawfully and failed to intervene.

A supervisor can be held liable for the actions of his subordinates under § 1983 if he personally participates in the act that causes the constitutional violation or where there is a causal connection between his actions and the constitutional violation that his subordinates commit. *Braddy v. Fla. Dep't of Labor and Emp't Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). A causal connection can be established if a supervisor has the ability to prevent or stop a known constitutional violation by exercising his supervisory authority and he fails to do so. *Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010).

The district court concluded that the plaintiffs failed to bring forward any evidence that the defendants directly violated the plaintiffs' constitutional rights or that they directed that the plaintiffs' constitutional rights be violated. The district court also concluded that the plaintiffs failed to adduce any evidence that the defendants knew that the plaintiffs' constitutional rights were being violated and failed to intervene. We agree.

22

We first turn to the plaintiffs' claims regarding the amphitheater. Although the amphitheater was locked down during certain times on November 20, 2003, which certainly implicated the plaintiffs' First and Fourth Amendment rights, they did not introduce any evidence that either the individual defendants directed that the amphitheater be locked down, or that they knew that it had been and failed to intervene. The plaintiffs also failed to adduce any evidence that the individual defendants knew that police officers were restricting access to the amphitheater to only obviously union-affiliated protestors or knew that police officers were doing so and failed to intervene. Likewise there is there no evidence that the defendant police officers directed that guns be drawn on Cavanaugh and Dion or that they knew that guns had been drawn on Cavanaugh and Dion and failed to intervene. Last, there is no evidence that the defendants ordered that Acuff be pinned down or that they knew that he had been and failed to intervene.

We now turn to Lee's Fourth Amendment claims. After the march ended, Lee returned to her hotel with AFL–CIO president John Sweeney and AFL–CIO secretary–treasurer Richard Trumka. After seeing Sweeney and Trumka off at the hotel, Lee and a colleague of hers decided to walk down Biscayne Boulevard. After walking a couple of blocks south from the hotel, Lee and her colleague noticed a line of police officers marching from the north towards them. Lee also

23

remembers a line of police officers approaching from the south. Now unable to return to her hotel, Lee and her colleague turned down a side street to avoid being ensnared by the police line. But the police officers turned and followed Lee and the rest of the crowd down the side street. Once on the side street, the police shot pepper pellets at the crowd. Lee was not hit by any pellets, but she was exposed to their fumes.

Lee was eventually able to turn onto another side street and head back north, and then east toward Biscayne Boulevard. On her way back to the hotel, Lee encountered a group of FLARA retirees who were returning to their bus. Unfortunately, the bus was parked on the side street the police had just marched down and from which Lee had just fled. Lee spoke with the retirees while her colleague called the bus driver and arranged for them to be picked up where they were. While they were waiting for the bus, two lines of police officers began closing in on Lee and the retirees. Fortunately, Lee and her colleague were able to speak with the police officers, who allowed the bus to come and pick up the retirees and for Lee to go on her way. After that, Lee made her way back to the hotel.

The district court acknowledged that the defendants were involved in ordering the police line to march north on Biscayne Boulevard as well as the

24

discharge of pepper pellets, but it concluded that Lee had not suffered a Fourth Amendment injury. We agree with the district court that Lee's Fourth Amendment rights were not violated when she was forced off Biscayne Boulevard or when she was exposed to pepper fumes. While we are less certain that Lee's Fourth Amendment rights were not implicated when she was caught between the two lines of police officers while waiting with the group of retirees, we conclude that there are other grounds for affirming the district court's judgment as there is no evidence the individual defendants ordered that action or knew that it occurred and failed to intervene.

A seizure occurs whenever the police "restrain[] the freedom of a person to walk away." *Brower v. Cnty. of Inyo*, 489 U.S 593, 595 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). Although Lee's freedom of movement was certainly restrained, she still had the ability to, and indeed did, walk away. Accordingly, we agree with the district court that despite the defendants' involvement in forcing Lee down the side street, she did not suffer a Fourth Amendment injury. We also conclude that Lee's incidental exposure to pepper fumes for a short period of time is not a sufficient basis to state an excessive force claim and thus the district court was correct to render summary judgment on this claim. *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)

25

(stating the "application of de minimis force, without more, will not support a claim for excessive force. . . .").

Last, we note that although Lee might have been seized when she was caught between the two police cordons along with the FLARA retirees, she failed to present any evidence that the defendants directed that seizure or knew that it occurred and failed to intervene. Accordingly, summary judgment was appropriate as to that claim as well.

ii. Civil Conspiracy Claims

To prevail on a § 1983 conspiracy claim a plaintiff must show that an agreement between two or more people (at least one of whom is a state actor) to violate his constitutional rights resulted in an actual violation of those rights. *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010). The existence of such a conspiracy may be proved by circumstantial evidence. *Id.* (citing *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 970 F.2d 785, 789 (11th Cir. 1992)).

In their motion for summary judgment, the defendants argued that the plaintiffs had not adduced any evidence that an agreement between the alleged conspirators existed. The plaintiffs argued that the FTAA training slide show, the coordinated police planning for the FTAA summit, and coordinated policing on November 20, 2003 were all circumstantial evidence of the existence of a

26

conspiracy. The district court concluded that they were not and we agree.

Although the FTAA slide show does (roughly) classify protestors according to their ideology and perceived potential for violence, it does not directly express any agreement among the defendants to deprive the plaintiffs of their constitutional rights. The plaintiffs could have defeated the defendants' motion for summary judgment if it were reasonable to infer from the slide show an agreement to deprive the plaintiffs of their constitutional rights. But it is not reasonable to draw such an inference. To begin with, the plaintiffs are classified as nonviolent and their events are described as "peaceful gatherings, protests, and marches." The slide show also says that the police's mission was "to ensure the civil liberties of law-abiding protestors and demonstrators are protected." Even though the slide show recognized the potential some protestors had for violence, union-affiliated demonstrators, like the plaintiffs, were described as law-abiding, peaceful protestors. It would be far from reasonable to infer that the slide show is circumstantial evidence of a conspiracy to do the opposite of what it says.

Nor can the planning and cooperation by law-enforcement agencies leading up to the FTAA summit support an inference that there was a conspiracy to violate the plaintiffs' civil rights. The only inference that can be drawn from such efforts is that the MPD felt it was ill-equipped to police the FTAA summit on its own.

27

Likewise, the events of November 20, 2003, are not evidence that the defendants agreed to deprive the plaintiffs of their constitutional rights. And in order to prevail on their claim the plaintiffs would have to prove that "the defendants 'reached an understanding' to violate the [plaintiffs'] constitutional rights." *Grider*, 618 F.3d at 1260 (quoting *Bailey v. Bd. of Cnty. Comm'rs*, 956 F.2d 1112, 1122 (11th Cir. 1992)). Although an agreement may be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct," as we discussed in evaluating the plaintiffs' supervisory liability claims, the plaintiffs have failed to bring forward any evidence of the defendants' conduct from which a reasonable fact-finder could make such an inference. *United States v. Schwartz*, 541 F.3d 1331, 1361 (11th Cir. 2008) (citing *United States v. Guerra*, 293 F.3d 1279, 1285 (11th Cir. 2002)).

After a review of the briefs, the evidence cited to by the parties, *see* Fed. R. Civ. P. 56(c)(1)(A), and the entire record, *see* Fed. R. Civ. P. 56(c)(3), as well as the benefit of oral argument, we conclude that the plaintiffs have not adduced any evidence that would create genuine issues of material fact necessary to support essential elements of their claims. Accordingly, we affirm the judgment of the district court.

**AFFIRMED IN PART, DISMISSED IN PART.**