[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14594

_____

D.C. Docket No. 2:09-cv-00529-JES-DNF

BRETT FIELDS,

Plaintiff-Appellee,

versus

CORIZON HEALTH, INC.
f.k.a. Prison Health Services, Inc.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____
(September 6, 2012)

Before DUBINA, Chief Judge, JORDAN, and ALARCÓN,[*] Circuit Judges.

PER CURIAM:

---

[*] The Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Brett Fields sued Prison Health Services, Inc.,[1] the provider of medical services for Lee County jails, as well as two Prison Health employees (Bettie Joyce Allen and Joseph Richards), for their allegedly unconstitutional refusal to furnish the medical care that he urgently needed. This refusal, said Mr. Fields, constituted cruel and unusual punishment. The case went to trial, where a jury found that Prison Health, through its policy or custom, refused to provide Mr. Fields proper medical attention in violation of the Eighth Amendment. Prison Health moved for judgment as a matter of law and, in the alternative, for a new trial. The district court denied these requests, and Prison Health now appeals the district court's rulings.[2] After reading the briefs, reviewing the record, and considering the parties' presentations at oral argument, we affirm.

## I. FACTUAL BACKGROUND

When we review a district court's denial of a Rule 50 motion for judgment as a matter of law, we consider the whole record. But we "disregard all evidence favorable to the moving party that the jury is not required to believe" and "give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving

---

[1] Prison Health changed its name to Corizon Health, Inc. in June of 2011, hence the name in the caption. The parties, however, refer to the entity as "Prison Health Services, Inc." throughout their briefs, and for simplicity's sake we do the same.

[2] Prison Health also seeks review of the district court's denial of its summary judgment motion. But, after a trial on the merits, we cannot review the denial of a summary judgment motion. *See Lind v. UPS*, 254 F.3d 1281, 1285 (11th Cir. 2001).

party that is uncontradicted and unimpeached.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). We also "draw all inferences in favor of the non-moving party." *O'Brien v. Columbia Palms W. Hosp. Ltd.*, 490 F.3d 1302, 1308 (11th Cir. 2007). With these standards in mind, we chronicle the facts that the jury was entitled to find.

## A. MR. FIELDS' INJURY

On July 6, 2007, Mr. Fields was being held in the Lee County jail after being convicted of two misdemeanors. At the time, Mr. Fields was an athletic 24-year-old man. He was by all accounts healthy, except for a bump about half the size of a tennis ball that swelled in his left arm. The bump resulted from a spider bite, and Mr. Fields had covered the bump and bite with gauze.

As soon as he entered the jail, Mr. Fields was sent to a concrete room. There two corrections officers checked him for drugs and weapons. The officers forced Mr. Fields to remove the gauze and then sent him to a nurse. The nurses and medical staff at the jail all worked for Prison Health, a company that contracted with Lee County to provide medical services to prisoners in the County's jails. Mr. Fields was seen by a nurse named Bettie Joyce Allen. Ms. Allen found Mr. Fields to be in good health. This was the first time Mr. Fields met Ms. Allen, but it would not be the last time, nor the most significant time.

The jail's medical staff sent Mr. Fields to an isolated part of the jail, where they

3

treated him for a staphyloccocal infection, which is commonly known as a staph infection. The treatment did not work, however. The swollen arm remained swollen, and so on July 14th Mr. Fields complained about his open lesion.

The reason for the treatment's failure was simple. A staph infection is caused by bacteria, which is generally treated by a form of penicillin called methicillin. But Mr. Fields did not have the garden-variety bacteria that causes a staph infection. His infection was caused, rather, by methicillin-resistant *Staphylococcus aureus*, commonly known as MRSA. As its name implies, MRSA is resistant to treatment through methicillin. So Mr. Fields' treatment did not work.

Mr. Fields again requested treatment on July 24th. In a medical-request form, Mr. Fields wrote that "the meds that were given to" him were "not helping the open wound." **Trial Ex. 1 at 15.** Apparently, the Prison Health medical staff eventually sent Mr. Fields to a medical block at the jail that dealt with MRSA infections. It appears that the Prison Health staff provided lax treatment, so that additional treatment also did not work.

On August 6th Mr. Fields felt his back go sore and numb. At first, as the young and healthy are apt to do, Mr. Fields swiped all concerns away. He believed that the soreness resulted from a pinched nerve or something trivial. But his pain increased.

On August 7th uncontrollable twitching affected his legs. For six hours, Mr.

4

Fields dealt with the pain. By a little after midnight on August 8th Mr. Fields could no longer tolerate the pain. The cell had an emergency button, and Mr. Fields, as well as his roommate, began to thump the button. Mr. Fields testified that he hit the button hundreds of times.

A Prison Health employee—a nurse—eventually showed up, and Mr. Fields explained the pain that he felt. The nurse did nothing, and told Mr. Fields that he would have to wait until the morning, when a doctor could examine him. His legs twitching uncontrollably, Mr. Fields continued to bang the emergency button to no avail. A corrections officer eventually ordered Mr. Fields and his roommate to stop pressing the button.

On the morning of August 8th Mr. Fields dragged himself to the shower. As he tried to return to his cell, his legs gave out, and he collapsed. Using walls and tables to counterbalance gravity, Mr. Fields hoisted himself to his cell, where he again collapsed.

By now, Mr. Fields could not walk and his lower body felt numb. Prisoners throughout screamed "man down," a prisoner-created alarm that, in theory, informed the medical staff of an emergency. Some corrections officers and nurses thereafter appeared at Mr. Fields' cell. They commanded Mr. Fields to get up, but he couldn't. Mr. Fields stayed on the floor until an officer brought a wheelchair. The officers lifted

5

Mr. Fields from the floor and placed him on the wheelchair. They then rolled him to the jail's medical department.

A nurse examined Mr. Fields at 8:55 a.m. In her notes, she wrote that Mr. Fields complained that he could not walk. *See* **Trial Ex. 1 at 13.** As soon as the nurse finished her examination, Mr. Fields met Joseph Richards, a physician's assistant who worked for Prison Health. Now, August 8th was a Wednesday, and Mr. Richards did not normally examine inmates on Wednesdays. But Mr. Fields' case constituted a medical emergency, Mr. Richards testified, and he therefore examined Mr. Fields. *See* **R. Vol. 8:118 at 92–93.** Mr. Fields recounted his symptoms, which included weakness, numbness, muscle spasms, and pain. He described his pain as a ten on a ten-point scale. Mr. Richards too wrote that Mr. Fields complained that he couldn't walk. *See* **Trial Ex. 1 at 13.**

Mr. Richards used a reflex hammer to test Mr. Fields' patellar reflex, i.e., to test his knee-jerk reaction. Nothing happened; Mr. Fields had no reflex at all. Mr. Richards also scraped Mr. Fields' feet with a pin. Although Mr. Fields could just feel the pin, he had no reaction whatsoever.

Despite these warning signs, and his realization that there was a medical emergency, Mr. Richards gave Mr. Fields only Tylenol before he left. A nurse and a corrections officer took Mr. Fields back to his cell. It was now about 9:30 a.m. on

6

August 8th, and a nurse recommend that Mr. Fields be housed in the medical block. After fifteen minutes, Mr. Fields was thrown into the back of a van. Corrections officers dragged him from the van, placed him in a wheelchair, and took him to the medical block. The officers placed Mr. Fields on the floor in a new cell and took the wheelchair.

Still in pain and now exhausted from lack of sleep, Mr. Fields asked every Prison Health nurse that came by his cell that day—about ten by Mr. Fields' calculation—for help. He informed them that he was exhausted, that his legs twitched without relent, that his lower body was numb, that his legs were weak. Like clockwork, or maybe as if by pact, all the nurses agreed on the same approach: they did nothing.

A little after midnight on August 9th, Mr. Fields attempted to use the bathroom for the first time in days. He crawled to the toilet, but then he felt his intestines escaping from his rectum. Mr. Fields panicked, and the inmates in his cell begin to holler "man down." Ms. Allen—the nurse who had checked Mr. Fields on his first day in jail—soon appeared. The inmates begged Ms. Allen to take Mr. Fields to the hospital. After corrections officers cleared the cell, Ms. Allen walked in. Mr. Fields explained that his intestines were coming out, and Ms. Allen demanded that Mr. Fields roll over. Mr. Fields, who was on the floor, explained that he couldn't move the lower half of his body. Ms. Allen jerked Mr. Fields' body, obtained some K-Y Jelly, and pushed the intestines back in.

7

Once she finished, Ms. Allen pushed Mr. Fields' legs back and forth. Mr. Fields, however, did not react. When she was done, Ms. Allen called Mr. Fields a liar. Ms. Allen stated that, if Mr. Fields had not gone to the bathroom for days, he would be in severe pain as she moved his legs. Mr. Fields explained that he could not feel anything below his stomach.

By now it was nearing 3:00 a.m. On Ms. Allen's orders, the corrections officers dragged Mr. Fields on top of a sheet and carried him on the sheet to an observation room. His pleas having been rejected by Ms. Allen, Mr. Fields dragged himself around the room, set up his bed, and tried to make himself comfortable. Ms. Allen, by her own deposition testimony, which was read to the jury, did not examine Mr. Fields further once he was placed in the observation room. In other words, there was no observation of Mr. Fields in the observation room.

Mr. Fields lay in agony throughout the early hours of August 9th. While in the observation room, Mr. Fields begged six Prison Health employees for help. Again, none so much as lifted a finger.

Dr. Noel Dominguez, a doctor who worked for Prison Health, arrived at work at the Lee County jail at 8:00 a.m. on August 9th—about 24 hours after Mr. Fields' paralysis began. Incredibly, neither Ms. Allen nor the other six Prison Health employees with whom Mr. Fields spoke informed Dr. Dominguez about Mr. Fields, despite the

8

fact that August 9th was a relatively light work day. Dr. Dominguez (who as noted was unaware of Mr. Fields' condition) therefore did not see Mr. Fields until 10:30 a.m. There is no explanation in the record for the two-and-a-half–hour delay, but the jury certainly could have inferred that the delay was in part due to the Prison Health employees' lack of concern about Mr. Fields and failure to tell Dr. Dominguez about Mr. Fields' condition.

Upon seeing Mr. Fields, Dr. Dominguez asked him what was wrong. Mr. Fields told him his symptoms. Dr. Dominguez then ran the same tests that Mr. Richards had performed. Immediately, he thought that there was something seriously wrong with Mr. Fields. Concluding that Mr. Fields needed an MRI, Dr. Dominguez commanded that Mr. Fields be sent to a hospital's emergency room right away.

Dr. Dominguez gave the command as soon as he finished his examination of Mr. Fields, but no one called an ambulance until 12:23 p.m. *See* **Trial Ex. 2 at 3.** The ambulance arrived within five minutes of being summoned.

Doctors at the hospital took an MRI of Mr. Fields' spine. The MRI showed that an abscess was compressing the spine. An abscess is a collection of pus that forms around tissue to protect other tissue from bacterial infection. Mr. Fields' abscess, unfortunately, formed near his spine, and, as it grew, it damaged the nerves in his spinal cord. This compression of his spine and damage to his nerves caused Mr. Fields'

9

numbness and eventual paralysis. Within hours of Mr. Fields' arrival at the emergency room, Dr. Jaime Alvarez operated on him to relieve the compression.

Time is crucial where an abscess compresses the spine. According to Dr. Dominguez, as well as Mr. Fields' medical expert, a patient who has the abscess removed within 24 hours of paralysis stands a good chance of recovery. That is, where a patient afflicted by spinal compression has an operation within 24 hours of his paralysis setting in, he or she is likely to walk again. But the odds plummet after those initial 24 hours.

The record shows that paralysis (as compared to numbness) afflicted Mr. Fields sometime after 8:30 a.m. on August 8th. Therefore, had Mr. Fields received treatment around that time on August 9th—around 24 hours later—he could have averted permanent damage to his legs. But he did not receive that treatment because Prison Health delayed his treatment. Because of this delay, Mr. Fields missed the critical 24-hour window. Though Mr. Fields can, after years of rehabilitation, now travel with a walker, he is still partially paralyzed from the waist down.

## B. PRISON HEALTH'S POLICIES

Remarkably, neither side introduced Prison Health's policy manual at trial. Instead, the parties introduced evidence of Prison Health's medical policies through the testimony of Ms. Allen and Prison Health's corporate representative. Prison Health's

corporate representative testified that nurses and physicians could send inmates to hospitals only in emergencies. *See* **R. Vol. 8:118 at 187.** Prison Health's corporate representative defined an emergency as a critical injury or life-threatening "injury or illness," but she never testified that this definition was communicated to the medical staff. **R. Vol. 8:118 at 187.** Ms. Allen corroborated part of this testimony. Nurses, Ms. Allen said, "weren't trained to designate whether somebody" had "to go to the ER;" to the contrary, "that's a doctor's job to do." **R. Vol. 8:118 at 71.** Hence, Prison Health allowed nurses to send inmates to the hospital only in an emergency, but then left them to figure out what an emergency was. To Ms. Allen, an emergency was narrowly defined as when someone is "dying any minute." **R. Vol. 8:118 at 71.** Ms. Allen elaborated on her definition by giving examples of "emergencies." She, for instance, had called ambulances where a man was beaten half to death and where a man had no pulse, but had placed inmates with partial paralysis in an observation room. *See* **R. Vol. 8:118 at 79–80, 86–87.**

Prison Health enforced its restrictive policy against sending inmates to the hospital. Ms. Allen testified that, at monthly nurses' meetings, medical supervisors "yelled a lot about nurses" sending inmates to hospitals. *See* **Vol. 8:118 at 65.** Repeatedly, Prison Health instructed nurses to be sure that the inmate had an emergency because it cost money to send inmates to the hospital. *See* **Vol. 8:118 at 71.** In fact,

11

Ms. Allen remembered three separate supervisors who emphasized the policy to her.[3]

As noted above, the abscess presented life-changing consequences for Mr. Fields if left untreated for more than 24 hours. It thus constituted an objective medical emergency.

In fact, Mr. Richards—one of Prison Health's own employees—saw Mr. Fields because the situation was a medical emergency. Both Dr. Dominguez and Mr. Fields' medical expert also testified that Mr. Fields had a medical emergency. After he tapped Mr. Fields with the reflex hammer and saw no response, Dr. Dominguez believed that Mr. Fields "needed to be sent to the emergency room right away." **R. Vol. 8:118 at 161.** And Mr. Fields' medical expert testified that there was no medical justification for refusing to send Mr. Fields to a hospital once he could no longer walk. *See* **R. Vol. 7:117 at 111.** Dr. Alvarez, the surgeon, agreed with the other two doctors. "[A]ny discovery of weakness in the legs," he said, "warrants immediate attention, immediate

---

[3] Because Prison Health's policy manual was not introduced at trial, the jury never heard evidence as to which definition of emergency—that provided by Prison Health's corporate representative or the more narrow one used by Ms. Allen and/or other Prison Health staff—was the operative one. Prison Health introduced a written policy at the summary judgment stage and now argues that we must consider it, even though it chose not to introduce that evidence at trial. This argument is frivolous. The legal standard for a motion for judgment as a matter of law requires courts to determine whether evidence introduced *at trial* supports the jury's conclusion. *See Bill John's Rests., Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983). It is incoherent to say that evidence that a jury never saw somehow supports (or undermines) that jury's conclusion. *See Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1137 (5th Cir. Apr. 1981) (noting that in deciding a motion for judgment as a matter of law courts look at the evidence introduced at trial).

action, to find out what's causing it." **R. Vol. 8:118 at 13.** He bluntly said that it is an emergency to find the cause of the legs' weakness. *See* **R. Vol. 8:118 at 14.**

Finally, like Mr. Fields' medical expert, Dr. Alvarez testified that, with Mr. Fields' symptoms, no medical justification existed for not taking an MRI. *See* **R. Vol. 8:118 at 24.** "[I]f the paralysis is obvious, any nurse or physician's assistant, any health-care personnel with some training, would be able to recognize that." **R. Vol. 8:118 at 34.** Even Mr. Richards recognized that partial paralysis would result from tumors, trauma to the spinal cord, or spinal compression. *See* **R. Vol. 8:118 at 129.** Significantly, there was no contrary testimony from Prison Health: Prison Health's medical expert testified that back pain was not a dire emergency but did not opine that paralysis is not a medical emergency.

Although these doctors testified that weakness in the legs requires, at the least, an MRI, Ms. Allen incredibly testified that she would not send someone with paralysis to the hospital. Prison Health had no MRI available in Lee County jails, but, when Ms. Allen had encountered inmates with symptoms of partial paralysis, she had simply "put them in an observation cell and put them down to see a doctor." **R. Vol. 8:118 at 86.** This was, Ms. Allen assured the jury, the norm. *See* **R. Vol. 8:118 at 87.** In light of this testimony by Ms. Allen, the jury was entitled to reject the testimony of Prison Health's corporate representative as to what constituted an emergency and find that

13

Prison Health had a custom or policy of not sending inmates with paralysis to the hospital unless they were near death.

## C. PROCEDURAL HISTORY

After four days of trial, the jury found that Mr. Richards and Ms. Allen had not violated the Eighth Amendment. The jury, however, found that Prison Health had a custom or policy that did violate Mr. Fields' constitutional rights. Specifically, the jury concluded that Mr. Fields had a serious medical need, that Prison Health was deliberately indifferent to his serious medical need, and that Prison Health's actions proximately caused Mr. Fields' damages. The jury awarded Mr. Fields $700,000 in economic damages and $500,000 in punitive damages.

In post-trial motions, Prison Health asked the district court to grant it judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Prison Health argued that there was insufficient evidence to show that it had a policy or custom of refusing to send inmates to hospitals. Prison Health also argued that Mr. Fields had not shown that its policy caused his injury. In the alternative, Prison Health requested a new trial under Rule 59. A new trial should have been granted, Prison Health asserted, because the jury did not follow the jury instructions, because the jury's verdict was inconsistent, and because the jury instructions were incorrect with regard to the punitive damages.

In a thorough 29-page order, the district court denied Prison Health's motion

for judgment as a matter of law or, alternatively, for a new trial. Prison Health appealed.

## II. STANDARD OF REVIEW

We undertake de novo review of a district court's denial of a motion for judgment as a matter of law. *See Lambert v. Fulton Cnty.*, 253 F.3d 588, 594 (11th Cir. 2001). Nevertheless, we must affirm the jury's decision "if there is evidence from which" the jury "reasonably could have resolved the matter the way it did." *Rodriguez v. Farm Store Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir. 2008).

We reverse a district court's decision on a motion for new trial only if the district court abused its discretion. *See Lambert*, 253 F.3d at 595. A district court should grant a new trial only where the "great weight" of evidence contradicts the jury's verdict. *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001).

## III. ANALYSIS

The Eighth Amendment to the United States Constitution states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. CONST. amend. VIII. The prohibition against cruel and unusual punishment applies to states under the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666–67 (1962).

For years, courts have recognized that a prison staff's deliberate indifference

15

"to an inmate's serious medical needs violates the inmate's right to be free from cruel and unusual punishment." *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). And a prisoner whose Eighth Amendment rights are violated may sue the prison staff members who violated those rights under 42 U.S.C. § 1983. That statute also allows the prisoner to sue the municipality—like a county—who runs the prison system. To do so, the prisoner must show that the municipality had a "custom or policy that constituted deliberate indifference to that constitutional right." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). The prisoner must show too that the custom or policy caused the constitutional violation, as respondeat superior liability is not permitted. *See id.* Although Prison Health is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state (or here, county) is performed by a private entity," that private entity, like a municipality, may be held liable under § 1983. *Ancata v. Prison Health Servs.*, 769 F.2d 700, 703 (11th Cir. 1985).

## A. SUFFICIENCY OF EVIDENCE AS TO POLICY OR CUSTOM

To show that the government denied him medical care in violation of his Eighth Amendment rights, a prisoner must show an objectively serious medical need and show that "the prison official's response to that need was poor enough to constitute an unnecessary and wanton infliction of pain." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (per curiam) (internal quotation marks omitted). A medical need is

16

serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). The prisoner must additionally demonstrate that the prison official or municipality acted with deliberate indifference. *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). As noted above, a municipality or entity like Prison Health is liable only where its custom or policy causes the constitutional injury. *See AFL-CIO v. City of Miami*, 637 F.3d 1178, 1187 (11th Cir. 2011). "When a municipal policy itself violates federal law . . . resolving issues of fault and causation is straightforward." *Id.* (internal quotation marks omitted). But, if the policy or custom is facially lawful, "the plaintiff must establish that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Id.*

Prison Health does not dispute that Mr. Fields had a serious medical need. Instead, Prison Health contends that Mr. Fields offered insufficient evidence to show that it had a policy or custom (1) that was deliberately indifferent to Mr. Fields' medical needs, and (2) that violated Mr. Fields' constitutional rights. After a review of the trial transcript and the exhibits, we disagree and conclude that the jury "reasonably could have resolved the matter the way it did." *Rodriguez*, 518 F.3d at 1264.

Prison Health is a private entity that provides medical services to prisoners in

17

Lee County's place, and so it can be held liable only if it had a "custom or policy that constituted deliberate indifference to [a] constitutional right." *McDowell*, 392 F.3d at 1289. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007). A policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented with "deliberate indifference as to its known or obvious consequences." *McDowell*, 392 F.3d at 1291.

We have repeatedly held that "deliberate indifference" includes "the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem," where "the delay does seriously exacerbate the medical problem," and where "the delay is medically unjustified." *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1235 (11th Cir. 2010) (quoting *Taylor*, 221 F.3d at 1259–60). A delay of even hours may be deliberately indifferent given the "reason for the delay and the nature of the medical need." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). The evidence at trial supports the jury's determination that Prison Health had a policy that delayed treatment of serious medical problems.

Both Ms. Allen and Prison Health's corporate representative testified that Prison Health did not allow nurses or physician's assistants to send inmates to hospitals, except

18

in emergencies. *See* **R. Vol. 8:118 at 70, 187.** Prison Health's representative defined "emergency" as a critical injury or life-threatening injury or illness, but the definition was not communicated to the medical staff, and the jury could have reasonably found that Ms. Allen and the rest of the staff defined "emergency" much more narrowly. According to Ms. Allen, under Prison Health's definition, the word "emergency" was restricted to a life-or-death situation. Except for those life-or-death situations, it was for a doctor to send an inmate to the hospital. *See* **R. Vol. 8:118 at 71.** Given the failure of Prison Health to introduce its policy manual, the jury could have accepted Ms. Allen's more-restrictive definition of emergency as the operative one.

The evidence at trial, moreover, supports Ms. Allen's definition over the corporate representative's. The nurse's reaction on the night that Mr. Fields hit the emergency button hundreds of time and the refusal of over a dozen Prison Health medical staff members to do anything in response to Mr. Fields' pleas for help indicate that "emergency" meant only a life-or-death situation. After all, the nurse told Mr. Fields that he would have to wait until a doctor saw him, and the staff members who later saw Mr. Fields or heard his pleas for help did absolutely nothing. Critically, Ms. Allen further testified that the norm at Prison Health was to put inmates with partial paralysis in an observation room and wait for a doctor to see them. It is, in fact, what she had done the previous times that she had come across partially paralyzed inmates. *See* **R.**

19

**Vol. 8:118 at 86–87.** And, as noted earlier, Prison Health never introduced a manual or policy guide at trial that described any other policy. Nor did Prison Health introduce anything in writing defining "emergency."

Despite not being a life-or-death situation, Mr. Fields' situation undoubtedly constituted a serious medical need under the Constitution. For Eighth Amendment purposes, the "medical need of the prisoner need not be life threatening." *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1989). *Accord Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("A medical condition need not be life threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated."). Thus, we have recognized that injuries like fractured hips and broken feet—which are unlikely to cause death and are far less serious than paralysis—constitute "serious medical needs." *See Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam); *Mandel v. Doe*, 888 F.2d 783, 790 (11th Cir. 1989). Constitutionally, paralysis is a serious medical need; medically, paralysis is a serious emergency.

At trial, the doctors testified without contradiction that *any form of paralysis*, partial or total, or weakness of the legs constituted a medical emergency. Mr. Fields' lack of reaction after being hit with a reflex hammer, Dr. Dominguez explained, was an emergency. *See* **R. Vol. 8:118 at 161.** And the doctors testified that delay in treatment

20

would "detrimentally exacerbate" Mr. Fields' medical problems. Treatment within 24 hours was critical to anyone in Mr. Fields' situation. Plus, anyone with any medical training (and for that matter anyone without any medical training) should have realized that Mr. Fields' paralysis required transportation to a hospital. *See* **R. Vol. 8:118 at 34.** Given Prison Health's extremely narrow definition of "emergency," and given the testimony presented at trial, the jury could reasonably conclude that Prison Health had a policy that improperly delayed treatment of serious medical needs, like paralysis, where such delay would detrimentally exacerbate an inmate's condition.

The jury could also have reasonably concluded that the delay here was medically unjustified. The doctors at trial testified that *no* medical justification existed for not sending Mr. Fields to a hospital and that any person with medical training would have known that Mr. Fields required medical help. *See* **R. Vol. 7:117 at 111; R. Vol. 8:118 at 13–14, 24.** And paralysis is such an uncommon, serious, and traumatic event that even someone without any medical training would have recognized the situation as requiring immediate care by a doctor. *See Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998) (noting that being wheelchair bound is a serious medical need to which even laymen are aware); *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Taylor v. Franklin Cnty.*, 104 F. App'x 531, 538 (6th Cir. 2004)) ("Such obvious signs of reoccurring incontinence and debilitating immobility were clear

21

symptoms of a serious problem, even if Defendants did not choose to believe Plaintiff.")).

Mr. Fields' objectively verified inability to walk, lack of reflexes, and incontinence so alarmed his fellow inmates that they begged Ms. Allen to take Mr. Fields to the hospital. Yet over a dozen Prison Health nurses ignored Mr. Fields' pleas. Mr. Fields also testified that Mr. Richards examined his reflexes and sensation—just like Dr. Dominguez did—with a similar result. *See* **R. Vol. 9:119 at 51–52.** But, unlike Dr. Dominguez, Mr. Richards did nothing except give Mr. Fields Tylenol. Mr. Richards acknowledged that trauma, tumors, and spinal compression would cause partial paralysis—all of which are weighty medical problems. *See* **R. Vol. 8:118 at 129.** A reasonable jury could have concluded that no medical justification explained the delay. The evidence, in sum, sufficed to permit a finding of deliberate indifference: "[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." *Ancata*, 769 F.2d at 704. *See also Brown*, 894 F.2d at 1538 ("[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference.").

Plus, if the jury did ask itself why Prison Health delayed treatment for Mr. Fields' paralysis, it could have concluded that it delayed treatment to save costs. Ms. Allen noted that the Prison Health supervisors yelled at nurses because the nurses sent inmates

22

to hospital. *See* **R. Vol. 8: 118 at 65.** Although Ms. Allen mentioned that some nurses sent inmates to hospitals when the inmates had no medical problems—testimony, by the way, that the jury was free to reject given its lack of corroboration[4]—she also said that Prison Health underscored that it cost "so much money" every time an inmate went to the hospital. **R. Vol. 8:118 at 70.** Apparently, Ms. Allen heard this mantra from three different Prison Health supervisors. *See* **R. Vol. 8:118 at 70–72.** The jury could have thus concluded that Prison Health delayed treatment to save money, which is not a medical justification. Although an entity like Prison Health can generally include cost allocations in formulating its policies, *see Craig v. Floyd Cnty.*, 643 F.3d 1306, 1312 (11th Cir. 2011), cost is not a factor which can justify the lack of timely medical treatment for something as serious as paralysis: "Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care or treatment of inmates." *Ancata*, 769 F.2d at 705. *See also Anderson v. City of Atlanta*, 778 F.2d 678, 688 n.14 (11th Cir. 1985) (noting that lack of funds cannot justify unconstitutional treatment of inmates).

---

[4] Ms. Allen also testified that she acted properly because she did not believe Mr. Fields was really in medical trouble. But the jury was not required to believe this portion of her self-serving testimony. This is especially true because Ms. Allen requested that the corrections officers move Mr. Fields to the observation room. As the Seventh Circuit wrote about a similar case, "why put him in" an observation room "if this was all an act?" *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012). Ms. Allen further testified that she had placed partially paralyzed inmates in observation rooms before, and the jury could have found that this was how she dealt with such a serious medical problem.

To hold Prison Health liable, Mr. Fields had to prove as well that Prison Health implemented its policy with "'deliberate indifference' as to [the policy's] known or obvious consequences." *AFL-CIO*, 637 F.3d at 1187. Three doctors testified that Mr. Fields faced dire consequences without timely medical treatment. Even Mr. Richards testified that only trauma, tumors, or compression to the spine, all of which are obvious dangers, would explain a healthy man's inability to walk. Partial paralysis, according to the medical testimony, would be an obvious emergency that required at the very least an MRI. And yet Prison Health's policy did not allow nurses to send inmates to hospitals in this very situation, as reflected not only by what happened to Mr. Fields but also by what Ms. Allen had done in prior cases of paralysis. Without prompt medical attention, the medical testimony indicated, the likelihood of paralysis skyrocketed. With this evidence, a jury could conclude that Prison Health implemented a policy while knowing that the policy would exacerbate inmate's paralysis.

Finally, a "plaintiff must prove causation by demonstrating that the municipality's 'deliberate conduct . . . was the "moving force" behind [his] injury.'" *McDowell*, 392 F.3d at 1292 (alterations in original) (emphasis omitted). *See also Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 967 (11th Cir. 2002) ("A plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (internal quotation marks omitted). Here, Mr. Fields had a serious medical need that

24

Prison Health's policy did not recognize as sufficient to warrant hospital care. And testimony at trial indicated that, had Prison Health sent Mr. Fields to the hospital earlier, paralysis could have been averted. A jury could therefore reasonably conclude that Prison Health's policy restricting the transportation to hospitals of inmates with serious medical needs was a direct cause of Mr. Fields' injuries.

## B. MOTION FOR NEW TRIAL

After the district court discharged the jury, Prison Health filed a written motion for a new trial under Rule 59. Prison Health sought a new trial on three grounds. First, the jury's verdict was inconsistent. Second, the district court inadequately instructed the jury on punitive damages. Third, the jury did not follow the jury instructions. Prison Health now raises these arguments on appeal, but each of them fails.

### 1. INCONSISTENT VERDICTS

In its first argument, Prison Health notes that the jury found neither Mr. Richards nor Ms. Allen liable but found Prison Health liable. The jury, Prison Health maintains, thus rendered inconsistent verdicts. Whatever the merits of this argument, Prison Health has forfeited it.

The verdict form, by Prison Health's admission, was "unquestionably a general verdict with answers to written questions." Appellant's Br. at 46. This type of verdict form falls within the bounds of Federal Rule of Civil Procedure 49(b). "As a general

25

rule, a party must raise a Rule 49(b) challenge to the form of the verdict and the jury's answers at the time they are announced . . . ." *Wilbur v. Corr. Servs.*, 393 F.3d 1192, 1200 n.4 (11th Cir. 2004). If a party does not object before a jury is discharged, that party forfeits the argument that the verdict is inconsistent. *See, e.g.*, *id.*; *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 534–35 (5th Cir. 1974). "The reason for this particular raise-it-or-lose-it rule is that, if the inconsistency is raised before the jury is discharged, the jury can be sent back for further deliberations to resolve the inconsistency in its verdict or interrogatory answers. Once the jury is gone . . . that is not possible." *Pensacola Motor Sales, Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1225 (11th Cir. 2012). Having failed to object to the inconsistent verdict before the district court discharged the jury, Prison Health has forfeited this argument.

## 2. JURY INSTRUCTIONS

Prison Health next argues that the district court should have defined "malice" in a certain way in its jury instructions. The verdict form asked the jury, when deciding whether to award punitive damages, to consider whether Prison Health "acted with malice or reckless indifference to" Mr. Fields' "federally protected rights." Prison Health wanted the instruction to define the word "malice" as "evil intent." The district court did not do so, and Prison Health contends that it is therefore entitled to a new trial. We disagree.

26

Simply put, a district court "enjoys broad discretion to formulate jury instructions provided those instructions are correct statements of the law," *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012) (per curiam), and we cannot conclude that the district court abused its discretion here. To the contrary, Prison Health's proposed definition of malice—"evil intent"—is too restrictive. Indeed, the Supreme Court has rejected the argument that "evil intent" is a prerequisite to an award of punitive damages under § 1983, deciding instead that a "reckless or callous disregard" standard suffices. *See Smith v. Wade*, 461 U.S. 30, 51 (1983).

### 3. THE JURY'S FAILURE TO FOLLOW INSTRUCTIONS

Finally, Prison Health asserts that it deserves a new trial because the jury did not follow the jury instructions. Prison Health describes this argument as follows:

> [T]he jury could not have followed the Jury Instructions because it found that both Allen and Richards were not aware of Fields' serious medical need and, therefore, could not have found that any PHS policy or custom causing [*sic*] them to deny him necessary medical care for that serious medical need.

Reply Br. at 11. If this is its argument, then Prison Health is again arguing that the jury rendered an inconsistent verdict. But, as already explained above, Prison Health forfeited that argument.

27

## IV. CONCLUSION

The judgment in favor of Mr. Fields and against Prison Health is affirmed.

**AFFIRMED.**

28